[No. E045763. Fourth Dist., Div. Two. Nov. 25, 2008.]

In re I.I. et al., Persons Coming Under the Juvenile Court Law.
SAN BERNARDINO COUNTY DEPARTMENT OF CHILDREN'S
SERVICES, Plaintiff and Respondent, v.
S.I., Defendant and Appellant.

## Counsel

Michelle L. Jarvis, under appointment by the Court of Appeal, for Defendant and Appellant.

Ruth E. Stringer, County Counsel, and Kristina M. Robb, Deputy County Counsel, for Plaintiff and Respondent.

Jennifer Mack, under appointment by the Court of Appeal, for Minors.

**O**PINION

**HOLLENHORST, Acting P. J.—**

## I. INTRODUCTION

S.I. (mother) appeals from the order terminating her parental rights to her children, I. (born in Jan. 2006), Mi. (born in Sept. 1999), and twins Ma. and Me. (born in June 2002) (collectively, the children) under Welfare and Institutions Code[1] section 366.26. Mother contends the juvenile court's finding that the children were adoptable was not supported by substantial evidence. Counsel for minors has filed a letter brief joining the position of the San Bernardino County Department of Children's Services (Department) urging us to affirm the juvenile court's orders. We find no error, and we affirm.

## II. FACTS AND PROCEDURAL BACKGROUND

The Department filed petitions under section 300, subdivisions (b) (failure to protect) and (g) (no provision for support), alleging the children had been found unattended; mother had an unstable lifestyle and lacked parenting skills; the motel room where they were living was cluttered and filthy; mother had a prior history of leaving the children unattended in motel rooms and cars; and mother had an extensive drug and criminal history. The petition alleged that J.M., the father of the three older children, had a drug and criminal history, and his whereabouts were unknown.

The detention report stated that mother had left the children alone in a motel room for at least an hour, and Mi. had reported that mother had previously left them alone for hours in motel rooms and cars. The motel room was filthy and contained drug paraphernalia and materials used to perpetrate identity theft. The report stated that the whereabouts of J.M. and of E.C., the alleged father of I., were unknown.

At the detention hearing in May 2006, the juvenile court found that a prima facie case had been established for detention of the children outside their home. The court ordered the Department to develop a case plan and provide reunification services for the parents, and the court ordered weekly supervised visitation.

The Department filed a jurisdiction/disposition report in May 2006. The report stated that Mi., who was then six years old, could not remember the

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

last time he had attended school. He could not read or write, and he was placed back in kindergarten. He was fearful of being left alone in a car.

Mi. and I. had been placed together in one foster home, and Ma. and Me. had been placed together in another foster home. All the children were reported to be doing well and none had exhibited any health problems. The paternal grandfather and stepgrandmother (referred to collectively as the paternal grandparents) were being assessed for relative placement.

At the jurisdiction/disposition hearing in July 2006, the court sustained the allegations of the petition as amended and found the children came within section 300, subdivision (b). The court found that mother had cooperated with the services ordered at detention but had not yet made sufficient progress toward alleviating the causes of the detention. The court ordered reunification services for the parents.

The Department filed a status review report in December 2006. The report stated that Mi., Me., and Ma. had been placed with their paternal grandparents, and I. had been placed with a separate foster family. Mother's visits with the children had been sporadic and infrequent, and she was evasive about her current circumstances.

The report stated that Mi., then seven years old, was "extremely handsome," "normally developing," and healthy. He was behind academically but had been showing improvement. He appeared to exhibit characteristics of attention deficit hyperactivity disorder (ADHD), in that he had difficulty concentrating and became easily distracted. He was fearful of being left alone, and he appeared to be insecure and to have low self-esteem, although he got along well with other children. Mi. "displayed characteristics consistent with being parentified, in that he was always worried about caring for his younger siblings . . . ."

Ma. and Me. were described as "beautiful and normally developing" and healthy four year olds. They were attending preschool and were active and talkative. Ma. had been unable to identify all her colors, but her caregiver had been working with the girls on doing so. Ma. and Me. argued with their siblings "within normal limits." Me. had had a problem with bedwetting but it had greatly improved. The stepgrandmother reported that the problem had frequently coincided with parental visits, and Ma. had smeared feces on the walls after visits.

I., then 11 months old, was described as "handsome and normally developing" and healthy. He had formed a strong and loving bond with his foster mother and was a happy baby, although he frequently woke up crying in the

night and had not developed normal sleeping habits for a child his age. He was very active and had begun to walk. The foster mother wished to have him placed with her on a long-term basis, although she was not willing to commit to adoption.

The paternal grandparents were not interested in providing a permanent home for Mi., Ma., and Me. They were close to retirement age, and the stepgrandmother had had some health issues. They were, however, committed to keeping the three oldest children in their home until an adoptive home could be located.

The Department recommended a concurrent plan of adoption for the children as a sibling set. The Department recognized that it would be difficult to place the large sibling set and requested the court to authorize listing the children through a national adoption network. A nonrelated extended family member, J.C., had contacted the social worker about the possibility of adopting all four children. J.C. had been a foster parent for many years and had met Mi., Ma., and Me. at family gatherings. However, her foster home had been decertified in June 2006, after a four-year-old child climbed out a window while supposedly taking a nap and had walked a quarter of a mile to a fast-food stand. The incident had occurred while J.C. had been at work and her then husband had been in charge of the children. The social worker had concerns whether J.C. could pass the background check and whether she could care for four active children.

At the section 366.21 hearing in February 2007, the court found that reasonable services had been offered but the parents had failed to complete their court-ordered treatment plans, and mother's progress toward eliminating the causes of the detention had been minimal. The court terminated reunification services and set the matter for a section 366.26 hearing.[2]

The Department filed an adoption assessment report in May 2007. The report stated the children were appropriate for adoption because of their ages and their current caretaker's willingness to adopt them. All the children were healthy. Since February 2007, all the children had been placed with M.A., a nonrelated extended family member. The children had adjusted well to living with her and appeared happy in her care. She lived in a four-bedroom home in a quiet neighborhood, and she was active in church and community. She understood the legal and financial responsibilities of adoption and was aware of the children's background and the difficulties they would face.

---

[2] On February 20, 2007, J.M. filed a notice of intent to file a writ after the juvenile court set the section 366.26 hearing. J.M.'s appointed counsel thereafter filed a nonissue writ, and this court dismissed the petition. On this court's own motion, we incorporated the record in the case of [J.]M. v. Superior Court, No. E042394, in the record in the present case.

Mi., then seven years old, was in first grade and doing well, although he should have been in second grade. He still showed symptoms of ADHD, had difficulty working independently, was very immature, and did not listen well. He was sensitive, cried easily, demanded attention, and was seeing a counselor.

The twins, then four years old, would be starting the Head Start program in the fall. They could dress themselves and brush their teeth and were otherwise independent. They were "constantly in motion" and were competitive for attention. They also showed ADHD behaviors and were seeing a counselor.

I. could walk, climb, and say several words. He slept through the night and took naps during the day. He ate well and could use a "sippy cup."

The Department filed a section 366.26 report in May 2007. Mother had visited the children in February 2007 for the first time in a long time. Mother inappropriately told the children they would be returning home to her, and by the end of the visit the children were upset and crying. At another visit in March, mother acted appropriately and the children appeared to enjoy spending time with her. Several weeks went by without mother contacting the social worker. Visitations with mother again took place in April and May.

At the section 366.26 hearing, counsel for the Department indicated that health issues had arisen with the children's caretaker, M.A., and requested that parental rights not be terminated and that the matter be continued for 180 days to identify and place the children in a concurrent planning home. The court stated that it appeared the children were part of a sibling group and efforts should be made to place them together. The court continued the section 366.26 hearing until October 2007.

In July 2007, the Department filed a section 387 petition requesting a change of placement for the children on the ground that their current caretaker, M.A., had been diagnosed with breast cancer and was scheduled for surgery, but her prognosis for a complete recovery was good. The detention report filed in connection with the petition stated that M.A. had been having difficulty with the children's behaviors, including poor impulse control, lack of boundaries, and extreme hyperactivity. The social worker had begun the process of obtaining a specialized care increment for the children. M.A. had reported having second thoughts about adopting the children, although she had an attachment to them.

The boys, Mi. and I., were placed together with their former foster parent, and the girls, Ma. and Me., were placed together in another foster home nearby. M.A.'s sister, J.C., again indicated a desire to adopt all four children.

At the detention hearing on the section 387 petition, the court found that a prima facie case had been established.

In August 2007, the Department filed a jurisdiction/disposition report in connection with the section 387 petition. M.A. had undergone surgery, and she wished to have I. returned to her care when she recovered. She did not feel she could care for all four children because of their behaviors and high energy levels. Also, she would be undergoing further surgery in six months.

J.C., who then lived in Arizona, had expressed continued interest in adopting the children. She had been a licensed foster parent for nine years but had been decertified based on the incident discussed above.

Mi. was then in second grade. Although he had not been diagnosed with ADHD, he had many symptoms. He sought attention, was defiant, and was unable to follow directions, play, or do his homework independently. He was insecure and constantly sought reassurance. He talked constantly and had a problem with lying. He did not get along well with other children, was frequently picked on by other children, and was destructive of his own toys and furniture items.

Ma. and Me. would soon be starting kindergarten. Ma. got along well with other children except for I.; she appeared to be jealous of him. She had a tendency to lie. Both girls had long temper tantrums and sometimes cried for hours. They both sought attention, and both had symptoms of ADHD. Ma. frequently scrambled her words, which suggested developmental and language delays. Me. did not know her colors. Both girls had problems with bedwetting, and Me. sometimes urinated on the floor to gain attention. Both girls were flirtatious with men, and Me. frequently masturbated.

I., then 18 months old, was "bursting full of energy" and never sat still "for even one minute." He had frequent and lengthy tantrums. He generally slept through the night, except he sometimes woke up crying before falling back to sleep.

The social worker stated that "great caution should be exercised in recommending that these children be placed together." The children's difficult behaviors had "worn out even the most seasoned and best intentioned caregivers." The social worker believed that if the children were kept together as a sibling set, their placement would fail. She therefore recommended that Mi. and I. be placed together, and that Me. and Ma. be placed together.

At the jurisdiction/disposition hearing on the section 387 petition, the court found that placement with M.A. was no longer appropriate, and the children

required a more restrictive level of care. The court ordered frequent and continuing sibling visitation.

The Department filed an addendum report in October 2007. M.A. had visited the children several times during her recovery from surgery. She remained actively interested in regaining custody of Mi. and I. The children visited each other weekly and saw one another at visits with other family members. The children enjoyed their visits together.

The Department identified four possible placements for the children: M.A., J.C., the G.'s, and the R.'s. M.A. stated she could not care for all four children but would like to adopt Mi. and I. She had recovered from her surgery and had an excellent prognosis; however, she would need to undergo reconstructive surgery within the next year. She had recently retired, and she intended to return to her former position part-time or become a foster parent for other children if the court did not place the children with her. She was keeping two beds available for the boys if they were returned to her.

ICPC (Interstate Compact on the Placement of Children) paperwork had been initiated for a foster home study of J.C.

The R.'s had expressed an interest in adopting Mi., Ma. and Me., but not I., because of his young age. The R.'s were friends of M.A.'s daughter and knew the children well. The R.'s had two sons, one of whom had ADHD, and they felt they could deal with the children's difficult behaviors.

The G.'s were the current caretakers for Me. and Ma., and they had expressed an interest in becoming the children's legal guardians.

Mi. was then eight years old and in second grade. He was doing well in school but he required extra tutoring to keep him focused. He sought constant attention through chattering, defiance, and inability to follow directions. He was insecure, needed constant reassurance, cried easily, and was picked on by and did not get alone well with other children. His current caretaker had not noticed any destructive tendencies. He had symptoms of ADHD and the social worker believed he would benefit from further counseling.

The twin girls had just started kindergarten but they were behind in their skills. Ma. got along well with other children but engaged in long temper tantrums. Both girls sought attention and talked incessantly, and they tended to lie. Both girls had problems with enuresis, both were flirtatious with men, and Me. frequently masturbated. The two girls played well together but both appeared to be jealous of I.

I. was "extremely hyperactive," and never sat still. He had showed some delay in language development and fine motor skills. He also had lengthy tantrums. Because of his high energy level, he had to be closely monitored.

The social worker repeated the recommendation that the children be placed for adoption in two separate groups rather than all together because of the children's difficult behaviors.

The contested section 366.26 hearing began in October 2007. The adoption social worker, Lavonna Downing, testified that the children were adoptable. In forming that opinion, she took into account the children's ages, health, willingness to be adopted, and desire to stay with their caretaker, M.A. She also considered their behavioral issues, such as neediness, M.A.'s ability to handle the children, and the children's responsiveness to M.A. In Downing's opinion, the children would still be adoptable by someone even if M.A. was not available because the Department had had inquiries from two different people who knew the children and wanted to adopt them. Downing testified that she did not believe M.A. should take all four children because, although M.A. had "very excellent skills with children," she had had "great difficulty managing all four of these children at the same time because these children are extremely needy." Downing described the children as very loving and sweet but extraordinarily active and needy of attention. She also testified the children shared a sibling bond and that her adoption assessment, prepared months earlier, did not discuss changes in the children's behaviors since they had left M.A.'s care. Downing did not know that Me. and Ma. both had been having hours-long tantrums or that they masturbated and flirted with men. She did not know that Mi. had few friends and was being teased by other children. She also did not know that I. did not sit still for even a minute and that he was behind in language and fine motor skills.

During a break in her testimony, Downing reviewed the Department's most recent report. She testified that nothing in that report would cause her to change her opinion that the children were adoptable.

The children's ongoing social worker, Nancy Clark, also testified the children were adoptable because three parties had expressed interest. Even though the children had difficult behaviors, they were loving. However, Clark did not feel an adoption would be successful if all four children were placed together, because no single caretaker could provide care for all the children with their behaviors. Clark testified that the children's visits with one another were chaotic, but the children loved one another and had a bond. She believed frequent sibling visitation was important because of that bond. She further testified that adoption was in the children's best interests, and their need for permanency "[a]bsolutely" outweighed the sibling relationship. She

testified that Mi., Ma. and Me. had had four placements, and part of the reason their placement with the paternal grandparents had failed was the children's behaviors. I. had also had four placements, but none of those placements had failed because of his behavior.

J.M.'s lawyer objected that the adoption assessment report and the October addendum were inadequate because they did not properly describe the efforts undertaken to identify prospective adoptive parents and did not sufficiently analyze the likelihood the children would be adopted. The addendum had been prepared by Clark, not the adoption social worker, who had not had contact with the children since they were detained on the section 387 petition in July 2007, although their circumstances had greatly changed since then.

The lawyers for J.M., E.C., mother, and the children all argued that the sibling bond exception to adoption should apply. Counsel for the children noted that at disposition, the juvenile court had found the children were a bonded sibling set. They had been raised in the same home before detention, and after detention they were in placements together or nearby so they had regular contact. She stated her belief that the sibling bond outweighed the benefits of adoption. She also believed the children were adoptable and that the Department had failed to make sufficient efforts to find a home for all the children together.

The juvenile court found that the adoptability assessment was incomplete because, among other things, it had not taken into account the greatly changed circumstances since its preparation. The court continued the hearing for 180 days so the Department could make further efforts to locate an appropriate adoptive family where all the children could remain together. The court also directed the Department to conduct psychological evaluations for the three oldest children.

The Department filed an addendum report in December 2007. The social worker requested that the children be listed on Web sites to find an adoptive home. The children remained in two separate foster homes.

The social worker reported that M.A. had indicated she no longer wished to adopt the two boys because of the excessive amount of time that had elapsed since the children's removal and the frustration she felt about the court appearances and leaving beds vacant. Later, after first stating she would still consider adopting the boys, M.A. stated she had again changed her mind and could not go through with the adoption, but she would support J.C. if the children were placed there. J.C. still desired to have all four children placed with her. The Department again recommended that the children be separated for adoption.

Psychological evaluations of the three oldest children were filed with the court.

Ma., then five and a half years old, was described as lively and bright. Ma. was the dominant twin. As a result of the trauma during her life, she had many reactive attachment disorder symptoms, including chronic anxiety, rage, and intense grief. She had not formed an attachment with a parental figure but had an exclusive attachment to her twin sister. The psychologist recommended that the twins be assisted to gradually tolerate differences in their appearance, school, and social activities so they could develop as individuals. Her teacher had recommended that she repeat preschool. The evaluator could not determine whether Ma. suffered from ADHD or mild brain damage associated with prenatal drug exposure, and the evaluator recommended further observation. Me. seemed more immature than Ma. She also showed symptoms of reactive attachment disorder, and she had an exclusive relationship with her twin. Her teacher had recommended that she repeat preschool. The evaluator stated the twins required the complete attention of a trained and experienced caregiver, and the evaluator also recommended therapy to address issues, including whether Me.'s sexualized behavior resulted from early exposure to adult sexual activity or sexual abuse.

The psychologist described Mi. as "a very bright, articulate, and perceptive 8 year old, who has been deeply affected by the chronic instability in his young life." He tested in the gifted range on standardized tests. He exhibited symptoms of ADHD, and the evaluator noted that the same symptoms could be due to mild brain damage from prenatal drug exposure. The evaluator recommended additional therapy and placement with an understanding and experienced caregiver who could give him full attention.

The Department filed addendums to the adoption assessments in March 2008. The boys had been living with M.A. since January, and she was then eager to pursue adoption. M.A. had been taking steps to address Mi.'s behavioral problems of constantly seeking attention, interrupting adults, and "messing with [I.]" Those steps included putting the boys in separate bedrooms and giving Mi. timeouts. The social worker had requested therapy for Mi., but the approval had not yet come through, and the social worker had recommended having him tested for ADHD. The social worker stated that Mi. appeared "very happy and open," and although he said he missed his sisters, he did not appear to be unhappy about living apart from them. Mi. was emotionally attached to M.A.

I. had become calmer since the last assessment and was learning to talk. The social worker described him as a friendly child who was easily redirected. He had learned to play by himself for short periods. I. was also emotionally attached to M.A.

The social worker reported that Ma. and Me. had been placed with J.C. in Arizona in February 2008, after having had two visits with her before their placement. The social worker brought the girls to Arizona and spent eight hours with them and J.C. The social worker observed that the girls shared a bond with J.C. J.C. reported that the girls were adjusting well.

As noted, M.A. and J.C. are sisters. They visit each other often and are both committed to keeping the children in touch.

When the section 366.26 hearing recommenced, the juvenile court stated it had read the transcript of the prior hearing as well as the reports submitted into evidence. The court held that there was clear and convincing evidence that it was likely the children would be adopted, and the court terminated parental rights.

## III. DISCUSSION

Mother contends the juvenile court's finding that the children were adoptable was not supported by substantial evidence, because (1) there was no evidence of any other approved homes that were willing to take the children or children with their characteristics, (2) the children had severe behavioral problems, and (3) the children were part of a large sibling set.

### A. Standard of Review

" 'In reviewing the juvenile court's order, we determine whether the record contains substantial evidence from which a reasonable trier of fact could find clear and convincing evidence that [the child] was likely to be adopted within a reasonable time. [Citations.]' . . . We give the court's finding of adoptability the benefit of every reasonable inference and resolve any evidentiary conflicts in favor of affirming. [Citation.]" (*In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1561–1562 [25 Cal.Rptr.3d 134].)

### B. Evidence of an Approved and Willing Home

Two potential adoptive placements had been found for the children. M.A. was interested in adopting Mi. and I.; M.A.'s sister, J.C., was interested in adopting the twin girls. M.A. had previously had all four children placed with her, and she knew the behavioral issues with which she would be faced, but she nonetheless desired to adopt the boys. She had regularly maintained contact with the children even during her recovery from health problems. J.C. had been a licensed foster parent for many years and had raised many children, including a developmentally disabled daughter. She had received her foster care license in Arizona. Mother contends, however, that

the children were not generally adoptable because there was no evidence of any *other* approved homes willing to take the children or children with their characteristics.

■ For the juvenile court to find a child adoptable, it is not necessary that an adoptive family be readily available. "The issue of adoptability posed in a section 366.26 hearing focuses on the *minor*, e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor. [Citations.] Hence, it is not necessary that the minor already be in a potential adoptive home or that there be a proposed adoptive parent 'waiting in the wings.' [Citations.]" (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649 [28 Cal.Rptr.2d 82].) However, the court must find by clear and convincing evidence that it is likely the child will be adopted within a reasonable time. (*In re Brian P.* (2002) 99 Cal.App.4th 616, 624 [121 Cal.Rptr.2d 326].)

■ However, the fact that a prospective adoptive family has been identified is an indication that the child is likely to be adopted within a reasonable time. " 'Usually, the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor. In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family.*' [Citation.]" (*In re Asia L.* (2003) 107 Cal.App.4th 498, 510 [132 Cal.Rptr.2d 733] (*Asia L.*).) Here, the willingness of M.A. and J.C. to adopt supports the finding of adoptability. Since it is not even necessary that one prospective adoptive home be identified before a child may be found adoptable, a fortiori, it is not necessary that backup families be identified.

## C. *Children's Behavioral Problems*

Mother contends the children's negative characteristics precluded a finding of adoptability. To support her argument, mother cites *Asia L.*, in which the court reversed the juvenile court's finding that siblings Ja., Jo. and A. were adoptable. Ja. displayed hyperactive behavior, needed constant supervision, and was often out of control in the classroom. He also suffered from asthma and early exposure to lead. (*Asia L., supra,* 107 Cal.App.4th at pp. 510–511.) A. was hyperactive, lied, stole, and hoarded things, and she suffered from enuresis, although she was healthy and on target developmentally. (*Id.* at p. 511.) Jo. was likewise hyperactive, suffered from asthma, and had behavioral problems. (*Ibid.*) Most importantly, however, the agency *had not produced any evidence of families willing to adopt children with similar*

*characteristics. (Ibid.)* On appeal, the court held that the evidence was insufficient to support the finding the children would likely be adopted, and the social worker's opinion, without more, was insufficient to support that finding. *(Ibid.)*

We find *Asia L.* distinguishable because here, as discussed above, prospective adoptive placements *had* been found for the children. Moreover, the children indisputably had positive characteristics that supported the finding of adoptability. The evidence showed that despite negative behaviors, the children were all healthy and had no major medical issues. The children were variously described as "handsome," "strikingly handsome," "adorable," "pretty," and even "exquisitely beautiful." All the children were described as affectionate. The psychologist's evaluation indicated that Ma. was within the average range of intellectual functioning, Me. was in the average to low average range, and Mi. was in the gifted range. The social worker testified that twins, and particularly female twins, were particularly desirable candidates for adoption. I. was consistently described as being full of energy. However, the recent addendum to the adoption assessment indicated he had become calmer and could more easily be redirected. His very young age further supported the finding of adoptability.

We conclude that the juvenile court's finding of adoptability is supported by substantial evidence.

### D. *Risk of Children Becoming "Legal Orphans"*

In contending that the evidence did not support the finding of the children's adoptability, mother argues that if adoption does not go through, "the children are at risk of becoming legal orphans." To support her argument, she cites *Asia L.*, in which the court stated there was no clear and convincing evidence that the children were likely to be adopted within a reasonable time. *(Asia L., supra,* 107 Cal.App.4th at p. 512.)

*Asia L.* was decided under a former version of section 366.26. In 2005, the statute was amended to add subdivision (i)(2), which provides that if a child has not been adopted after three years following the termination of parental rights, the child may petition the juvenile court to reinstate parental rights. (Stats. 2005, ch. 640, § 6.5.) Thus, under the current statute, there is no danger of the children becoming legal orphans.

### E. *Membership in a Sibling Set*

Mother argues that the children were not generally adoptable because of their membership in a large sibling set.

■ The child's membership in a sibling set is a relevant consideration in determining whether an *exception* to termination of parental rights exists (§ 366.26, subd. (c)(1)(B)(v)), as further discussed below, or in determining whether the child is *difficult to place* for adoption (§ 366.26, subd. (b)(3)). However, the statutory scheme and case law require a determination of the adoptability of a child as an individual: " 'The issue of adoptability . . . focuses on the minor, e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor. [Citations.]' " (*In re Zeth S.* (2003) 31 Cal.4th 396, 406 [2 Cal.Rptr.3d 683, 73 P.3d 541].)[3]

■ Thus, mother's argument is, in essence, a challenge to the juvenile court's determination that the sibling relationship exception to adoptability did not apply. If the juvenile court finds the child adoptable, the juvenile court must terminate parental rights unless the court finds a "compelling reason for determining that termination would be detrimental to the child" due to one or more of the statutorily enumerated circumstances. (§ 366.26, subd. (c)(1)(B)(i)–(vi).)

One such exception to adoptability applies when "[t]here would be a substantial interference with a child's sibling relationship . . . ." (§ 366.26, subd. (c)(1)(B)(v).) In considering whether that exception applies, the juvenile court must take into consideration whether the siblings were raised in the same home, whether they shared significant common experiences or had close and strong bonds, and whether ongoing contact outweighs the child's interest in the benefit of legal permanence through adoption. (*Ibid.*) The focus is on the best interests of the child being considered for adoption, not on the interests of the child's siblings. (*In re Naomi P.* (2005) 132 Cal.App.4th 808, 822 [34 Cal.Rptr.3d 236].)

It was undisputed that the children had been raised together for much or most of their lives and that they shared close and strong bonds. However, their social worker testified that the children's best interests were served by the permanency of adoption, and keeping the children together was not in their best interests. The social worker stated in her reports that keeping all

---

[3] We note that in *In re B.D.* (2008) 159 Cal.App.4th 1218 [72 Cal.Rptr.3d 153], the court held that the juvenile court's finding that a group of siblings was adoptable was not supported by substantial evidence because the children were strongly bonded and needed to retain their sibling ties, and "the size of the sibling group and the children's emotional, developmental and behavioral problems belie[d] a finding that they [were] specifically or generally adoptable." (*Id.* at p. 1230.) The court noted "there [was] no evidence in the record to support a finding that [three of the children] were likely to be adopted as a sibling group within a reasonable time." (*Id.* at p. 1233.) We disagree with *In re B.D.* to the extent it held that a finding of adoptability in the context of a bonded sibling group requires a finding that the children are likely to be adopted *as a sibling group* within a reasonable time.

four children together would "be setting up both the children and the caregiver for future failure in their adoptive placement." The psychologist's evaluations supported this opinion; the psychologist stated in her report that Ma. and Me. would require the complete attention of their caregiver and should not be placed in a home where there were other fragile children. The psychologist recommended that Mi. needed "the full attention of an understanding and experienced caregiver . . . ."

We conclude substantial evidence supports the juvenile court's finding that the sibling relationship exception to adoption did not apply.

## IV.  DISPOSITION

The orders appealed from are affirmed.

Gaut, J., and King, J., concurred.