Filed 7/12/13  In re K.K. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re K.K. et al., Persons Coming Under the Juvenile Court Law. | B245255 |
| | (Los Angeles County Super. Ct. No. CK69615) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| N.O., | |
| Defendant and Appellant. | |

Appeal from an order of the Superior Court of Los Angeles County.  Anthony Trendacosta, Juvenile Court Referee.  Affirmed in part; reversed in part and remanded with directions.

Lori A. Fields, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Jacklyn K. Louie, Deputy County Counsel for Plaintiff and Respondent.

* * * * * * * *

Appellant N.O. (mother) appeals from the juvenile court's order terminating her parental rights to two of her minor children and finding the children adoptable. Mother argues there is no substantial evidence supporting the court's determination the children are both generally and specifically adoptable. Mother further contends notice pursuant to the Indian Child Welfare Act (ICWA) was deficient. We conclude substantial evidence supports the court's order finding the children adoptable and affirm that finding.

However, as respondent Department of Children and Family Services concedes, the ICWA notice was deficient. Therefore, we conditionally reverse the order terminating parental rights and remand with directions to the juvenile court to order the Department to make reasonable inquiry regarding possible Indian ancestry, and to re-serve all requisite ICWA notices. If, after receiving proper notice, no timely response is received or no tribe indicates the children are Indian children within the meaning of ICWA, then the juvenile court shall reinstate its order terminating parental rights. If however, any response raises a substantial question the children are Indian children, the trial court shall hold further proceedings consistent with the statutory scheme.

## FACTUAL AND PROCEDURAL BACKGROUND

This dependency case has been pending since 2007. Because mother challenges only the court's order of September 11, 2012, finding the children adoptable, and the adequacy of the ICWA notices, we summarize only those facts and procedural issues germane to our discussion of those issues, as well as some additional matters for context.

Mother's two minor children, K.K. and E.O., came to the attention of, and were detained by, the Department in August 2007 based on a referral of general neglect. At the time of detention, K.K. was nine years old and E.O. was eight months old. The children lived with mother and an adult half brother. During its investigation, the Department learned mother had been seen swinging E.O. in a circular motion by one of his arms, often yelled at the children or left them unattended, and otherwise exhibited erratic behavior. Mother had an 18-year history of substance abuse (cocaine and marijuana), suffered from mental health issues, including bipolar disorder, and had a lengthy criminal record.

The Department filed a petition pursuant to Welfare and Institutions Code section 300.[1] At the adjudication hearing, the court sustained the petition pursuant to section 300, subdivisions (a) and (b) based on the allegations of mother's physical abuse of E.O. and mother's substance abuse and mental health issues which resulted in her failing to provide and care for the children.

The maternal aunts cooperated with the Department's investigation. E.O. had been born with a cleft palate and suffered from additional congenital anomalies, including hypertelorism (wide-spaced eyes). Mother had not been consistent in taking E.O. to his doctors for recommended corrective surgeries and general medical care. K.K. had some developmental delays, did not read well, and was having difficulty in school. The aunts believed she had been diagnosed as suffering from attention deficit disorder. K.K. also reported sexual abuse by her adult half brother. Aunt B.G. explained mother's long history with substance abuse and that she had taken care of the children in the past when mother had been incarcerated. She said the family always stepped in to help. B.G. expressed interest in taking custody of the children again.

After only several days in B.G.'s care, the children were returned to the Department because mother threatened to burn down B.G.'s house. The children were placed with their adult half sister, K.G., who expressed an interest in adopting her siblings. However, after the home study for the half sister had been initiated, the social worker visited the home for an inspection and smelled marijuana. The children were subsequently removed from K.G.'s home and placed with a nonrelative foster care parent.

Mother initially denied any Indian heritage. The detention report indicates that according to unspecified "family members," the family had no Indian ancestors. However, at the August 21, 2007 hearing, a maternal aunt reported there might be Sioux

---

[1] All further undesignated section references are to the Welfare and Institutions Code.

or "Sequoia" Indian heritage on their side of the family.[2] The court ordered the Department to interview the maternal aunts and send appropriate notices. Mother routinely resisted speaking with the social workers concerning her possible Indian heritage, but over a year later, reported she had Blackfoot ancestry through a "maternal grandfather William S." The court ordered that notices be forwarded to the Blackfoot tribes and to the Bureau of Indian Affairs (BIA). Notices were sent to the Blackfoot tribe and BIA, but the notices did not identify William S. or otherwise provide any information regarding him. Mother further reported she spoke with an aunt and a cousin who denied any Indian heritage in the family and that those two relatives did not want to speak directly with the Department about it. The court made a finding ICWA did not apply.

The Department made extensive efforts to afford mother the opportunity to obtain reunification with her children. Mother was often uncooperative with the social workers and routinely failed to appreciate the best interests of the children. For instance, despite knowledge of the sexual abuse allegations by K.K. regarding her adult half brother and an order that K.K. not have contact with him, mother would attend visits with the children in the company of the half brother. Mother also sought to have K.K.'s therapy terminated as unnecessary. Most significantly, mother continued to abuse drugs and engage in conduct resulting in her incarceration on numerous occasions during the pendency of these proceedings.

Following one such period of incarceration, mother began to make progress with services, including regularly testing clean and completing a parenting class. Visits with the children went well and the Department recommended a return of the children to mother. The court followed the Department's recommendation, ordered the children released to mother, and ordered family maintenance and family preservation services. On September 22, 2009, the children were placed with mother, who was living at that time with one of her sisters, and the sister's two teenage daughters.

---

[2]     The Department reported there is no federally recognized "Sequoia" tribe.

Upon regaining custody of her children, mother almost immediately relapsed into abusing drugs, tested positive for cocaine, and left the children unsupervised at night outside the home. The Department filed a section 342 petition, citing section 300, subdivision (b), and once again detained the children and placed them in foster care. In March 2010, K.K. was placed in the foster home of Ms. E., while E.O. was placed in the foster home of Ms. D. The children have stayed in those placements since that time. Ms. E applied to adopt K.K. and Ms. D. applied to adopt E.O.

On September 15, 2010, the court sustained the section 342 petition and terminated the home-of-mother placement order, as well as further reunification services for mother. The court identified adoption as the permanent plan for both children.

The assessment reports document the children's special needs in depth, and identify the steady progress each child was making with the provision of court-ordered services and the care and attention provided by Ms. D. and Ms. E. Both prospective adoptive parents consistently maintained their desire to adopt. Ms. D. declined to take on additional foster children, because of her attachment to E.O. and her desire to focus her attention on his well-being. K.K.'s care was funded at a higher rate, but Ms. E. agreed to accept the basic rate to ensure K.K. would be placed with her. Each prospective parent indicated her respective belief that adoption would offer the most stability for the children as opposed to legal guardianship or other alternative plan. Home studies were initiated with both prospective adoptive parents.

The home study was completed and approved as to Ms. D. However, an update was required after Ms. D. suffered a medical condition requiring surgery in March 2012. The Department requested medical clearance from her doctor that her medical problem did not impact her continued ability to provide a permanent home for E.O.

There was some delay in completing the home study for Ms. E. because of an initial error by the Department in forwarding her the paperwork and because of her work schedule as a bank trust officer. Ms. E. consistently maintained her desire to adopt K.K., stating she loved K.K. like she was her biological child. Ms. E. had previously adopted

5

another child and the Department did not identify any legal impediments to her being approved to adopt again.

In January 2012, the Department reported that adoption remained the best option for the children, explaining "Ms. D and Ms. E continue to express their desire to adopt [E.O. and K.K.] respectively and to provide them with a permanent plan. Both caregivers treat the children as their own biological children. The children have bonded with the family and have developed an ongoing attachment with the family members."

E.O. was reported to be excelling in first grade, receiving awards for math and language proficiency, good attendance, and being on the honor roll. The school psychologist described E.O. as "functioning in the high average range of cognitive ability," with "very strong math skills," an ability to make friends easily, and generally a "kind" and "loveable" child. The surgical interventions he had received had improved his congenital anomalies, although his doctors reported that some additional corrective surgeries would be required, including a procedure to assist with some mild conductive hearing loss. E.O. was not a regional center client. Ms. D. was described as a strong advocate for E.O. who provided a "loving and supportive environment" for the child.

K.K. was getting ready to start high school in September and looking forward to participating in track and field sports. Her behavior continued to improve due to the high level of care and commitment she was receiving from Ms. E. According to K.K.'s therapist, K.K. was more outspoken, had greater self-esteem and was learning to take responsibility for her actions. She had also made strides in coping with and relating to "the traumas she had experienced in the past while in the custody of her mother." K.K. was "doing well and making lots of improvement/adjustments as to her behavior." Ms. E. was reported to be fiercely protective of K.K. and a good caregiver who loves K.K. "unconditionally."

In "last minute information" reports submitted for each child for the permanency planning hearing, the Department reported on the status of the home studies. As to Ms. E., the Department reported the home study was complete, except for a final meeting, scheduled for the next day, with Ms. E. at her home to interview the two other

6

children who live with her, including a biological child and the other adopted child. The social worker reported, "This last appointment removes any impediment to the completion of the process." As to Ms. D., approval was pending on the supplemental home study regarding Ms. D.'s postsurgery health status. The social worker reported she did "not foresee any barriers to the approval of the home study update."

The contested section 366.26 hearing was held September 11, 2012. Mother, who was again incarcerated on a probation violation, was present, in custody, and represented by counsel. The court received, without objection, the Department's section 366.26 reports dated September 14, 2011, and January 11, 2012, interim review report dated June 14, 2012, the status review report dated August 16, 2012,[3] the "last minute information" reports for each child dated September 11, 2012, and both of the children's birth certificates. Mother testified briefly, explaining she had weekly visits with the children on Saturdays, but since she had been incarcerated she was writing letters to them instead or trying to call. She expressed her love for her children and her desire to complete an outpatient program upon her release and regain custody. She conceded on cross-examination the last time she regained custody of the children, she relapsed and started using cocaine again and the children were returned to foster care. During argument, counsel for mother acknowledged a lack of evidence showing a legal basis for an exception to the termination of parental rights.

In terminating parental rights, the court found no statutory exception preventing termination had been established. The court found by clear and convincing evidence that, despite the children's special needs, there was nothing in the record indicating they were not likely to be adopted within a reasonable time. The court found the children to be both generally and specifically adoptable.

This appeal followed.

---

[3] The reference to the final status report of August 16, 2012, as the "September 11, 2012" report appears to be a typographical error. Only the two "last minute information" reports for the court are dated September 11, 2012, the day of the continued hearing.

DISCUSSION

## 1. Substantial Evidence Supports the Court's Order Finding the Children Adoptable

Mother does not urge us to reverse the order terminating parental rights and return the children to her custody. Mother concedes the current caregivers are committed to the children, and that the children are receiving excellent care and have formed close emotional relationships with them. Rather, mother argues there is no substantial evidence supporting the finding the children are generally adoptable, given their special needs, and that without completed home studies for the two prospective homes, the special adoptability finding is improper as well. Mother argues if there is an impediment to either of the two prospective adoptive mothers formally adopting the children, they will be at risk of becoming legal orphans and separated from the caregivers to whom they have become bonded. Mother argues there is no evidence suitable alternative adoptive homes could be found for either child in a reasonable period of time in accordance with the statutory scheme. Mother contends the court's order was premature, given the lack of approved home studies, and the court should have considered alternative plans under section 366.26, subdivision (c)(1)(B)(iv) such as legal guardianship or long-term foster care with the current caregivers. We are not persuaded.

"A finding of adoptability requires 'clear and convincing evidence of the likelihood that adoption will be realized within a reasonable time.' [Citation.] The question of adoptability usually focuses on whether the child's age, physical condition and emotional health make it difficult to find a person willing to adopt that child." (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1231.) In reviewing a juvenile court's finding of adoptability, we are governed by the substantial evidence test. "[W]e view the evidence in the light most favorable to the trial court's order, drawing every reasonable inference and resolving all conflicts in support of the judgment." (*In re Marina S.* (2005) 132 Cal.App.4th 158, 165; accord, *In re B.D.*, *supra*, at p. 1232.) It is mother's burden to establish "there is no evidence of a sufficiently substantial nature to support the finding or order." (*In re R.C.* (2008) 169 Cal.App.4th 486, 491.)

8

Substantial evidence supports the juvenile court's finding E.O. and K.K. are generally adoptable. Both E.O. and K.K. have special needs. E.O. was born with several congenital anomalies, including a cleft palate. He has already undergone numerous surgeries and his doctors indicate he will require additional corrective surgeries during his adolescence. K.K. has some developmental and behavioral issues, and is over the age of seven. But, the existence of medical, developmental or behavioral challenges does not preclude a finding of adoptability. (See *In re Helen W.* (2007) 150 Cal.App.4th 71, 79 [affirming finding of general adoptability for two children with significant medical and psychological problems]; see also *In re R.C.*, *supra*, 169 Cal.App.4th at p. 492 [affirming finding of general adoptability despite child's "in utero exposure to heroin, slight speech delays[,] the absence of an identified father," and the possibility of additional future medical problems related to drug exposure].)

Moreover, the record is replete with documentation that these children have not only greatly improved developmentally while living with their respective caregivers, but also possess numerous positive qualities. E.O. is doing exceptionally well in school, is developmentally on target, and is generally described as a loving and happy child. K.K. has made great strides in overcoming her behavioral issues, largely stemming from experiences suffered while in mother's custody. She has started high school and is looking forward to participating in track and field sports. K.K.'s therapist reported she has shown improved self-esteem and ability to work through the negative events of her past. By all accounts, both children are described as strongly bonded to their respective caregivers, and have loving relationships with them and their extended families.

Both Ms. D. and Ms. E. are fully aware of E.O.'s and K.K.'s respective special needs and are committed to helping them flourish and move beyond their difficult past. Both women have proved to be conscientious advocates for the children's needs, and their medical and behavioral challenges have improved dramatically while in their care. They work closely with Department staff and all service providers, and have acknowledged an understanding and appreciation of what will be required of them as adoptive parents.

The children's positive attributes combined with the unwavering desire of both caregivers to adopt the children strongly supports the court's finding of adoptability. "[T]he fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor. In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family*." (*In re Sarah M*. (1994) 22 Cal.App.4th 1642, 1649-1650; accord, *In re I.I.* (2008) 168 Cal.App.4th 857, 869-870 [affirming finding of adoptability based in part on willingness of prospective adoptive parents to adopt, and rejecting argument that lack of "backup families" prevents finding of adoptability]; *In re A.A.* (2008) 167 Cal.App.4th 1292, 1311-1314 [affirming finding of adoptability for two siblings with developmental delays and attachment disorder who possessed other positive qualities and prospective adoptive parents willing to adopt].)

The fact the supplemental adoptive home study for Ms. D. and the adoptive home study for Ms. E had not been finalized at the time of the section 366.26 hearing does not undermine the propriety of the court's order. "[T]here is no requirement that an adoptive home study be completed before a court can terminate parental rights. The question before the juvenile court was whether the child was likely to be adopted within a reasonable time, not whether any particular adoptive parents were suitable. [Citation.] '[T]he question of a family's suitability to adopt is an issue which is reserved for the subsequent adoption proceeding.' [Citation.]" (*In re Marina S*., *supra*, 132 Cal.App.4th at p. 166.) Ms. D. had been previously approved and needed only to obtain supplemental approval based on clearance from her doctor that her 2012 surgery did not impact her ability to care for E.O. The home study had been completed for Ms. E. and only a final home inspection was necessary to finalize it. Ms. E. had previously adopted another child. Nothing in the record shows the existence of any legal impediment to successful adoptions by both prospective adoptive mothers. The court's adoptability finding is properly affirmed.

## 2. The ICWA Notices Were Inadequate

The Department concedes ICWA notice was not adequate, and does not oppose a limited reversal to give it the opportunity to complete "proper ICWA inquiry and notice" to the federally recognized Sioux and Blackfoot tribes.

A limited reversal to allow for substantial compliance with ICWA is appropriate. A conditional reversal of an order terminating parental rights "'does not mean the trial court must go back to square one,' but that the court ensures that the ICWA requirements are met. [Citations.] 'If the only error requiring reversal of the judgment terminating parental rights is defective ICWA notice and it is ultimately determined on remand that the child is not an Indian child, the matter ordinarily should end at that point, allowing the child to achieve stability and permanency in the least protracted fashion the law permits.' [Citation.]" (*In re Gabriel G.* (2012) 206 Cal.App.4th 1160, 1168; see also *In re Francisco W.* (2006) 139 Cal.App.4th 695, 705-707.)

The threshold for triggering ICWA notice requirements is low. (*In re Gabriel G.*, *supra*, 206 Cal.App.4th at p. 1165 ["'the juvenile court needs only a suggestion of Indian ancestry'"].) The Department is charged with "an affirmative and continuing duty" to inquire whether a dependent child is an Indian child within the meaning of ICWA and section 224.3, subdivision (a). (*In re Gabriel G.*, at pp. 1165-1166.) The record here is ambiguous as to the adequacy of the Department's efforts to obtain available family history information and of the notices given by the Department to comply with ICWA and section 224.2 regarding mother's possible Indian heritage. For instance, there is no documentation concerning what efforts, if any, were made to speak with mother's siblings, all of whom according to aunt B.G. live in the Los Angeles area. Despite maternal aunt's statement the family had possible Sioux heritage, no notice was provided to the Sioux tribes. And, while notice was sent to the recognized Blackfoot tribes and BIA, the notices did not identify the maternal grandfather that mother had reported was the relative with possible Indian ancestry (William S.).

The Department must make reasonable efforts with mother and her immediate family members to discharge its inquiry duty to obtain relevant information for the

notices. The Department must then serve statutorily compliant notices on the requisite tribes. If, after receiving proper notice, no timely response is received or no tribe indicates E.O. and K.K. are Indian children within the meaning of ICWA, then the juvenile court shall reinstate its order terminating parental rights, and proceed with finalizing the adoption process for both children. If however, any response raises a substantial question the children are Indian children, the trial court shall hold further proceedings consistent with the statutory scheme.

## DISPOSITION

The juvenile court's September 11, 2012 order finding K.K. and E.O. adoptable is affirmed. However, we conditionally reverse the court's order terminating parental rights and remand with directions to the juvenile court to order the Department to make reasonable inquiry regarding possible Indian ancestry, and to re-serve all requisite ICWA notices. If, after receiving proper notice, no timely response is received or no tribe indicates E.O. and K.K. are Indian children within the meaning of ICWA, then the juvenile court shall reinstate its order terminating parental rights. If however, any response raises a substantial question the children are Indian children, the trial court shall hold further proceedings consistent with the statutory scheme.

GRIMES, J.

WE CONCUR:

BIGELOW, P. J.

RUBIN, J.

12