Filed 11/9/20  In re A.G. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.G., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E075280 |
| Plaintiff and Respondent, | (Super.Ct.No. J278323) |
| v. | OPINION |
| A.M., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Affirmed.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant.

Michelle D. Blakemore, County Counsel, and David Guardado, Deputy County Counsel, for Plaintiff and Respondent.

1

## I.

## INTRODUCTION

Antonio M. (Father) appeals the juvenile court's order terminating his parental rights to two-year-old A.G. and freeing A.G. for adoption. Father contends substantial evidence does not support the juvenile court's finding that A.G. was adoptable. We disagree and affirm.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A.G.'s mother S.G. (Mother) gave birth to a child, A., who tested positive for methamphetamines. Mother informed the San Bernardino Department of Family and Child Services (the Department) that Father was not A.'s father, but he was A.G.'s father. Father confirmed that he was A.G.'s father, but that A.G. was not in his care. A.G. and A. were removed from Mother's care and A.G. was placed with Father.

In October 2018, the Department filed a petition under Welfare and Institutions Code section 300, subdivision (b),[1] stating that Father had a history of substance abuse. At a detention hearing, the juvenile court ordered A.G. and A. removed from Mother's care and that A.G. remain in Father's care. The juvenile court set a combined jurisdiction/disposition hearing for November 26, 2018.

---

[1] Unless otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

In preparation for the hearing, the Department prepared a report. The Department reported, among other things, that A.G. had no behavioral issues.

The juvenile court held a jurisdiction/disposition hearing on November 26, 2018, which only Mother attended. Mother reported that Father was not making A.G. available for scheduled visits. The juvenile court continued the hearing to January 14, 2019, so Mother could obtain a paternity test for A.

On January 10, 2019, the Department filed an amended section 300, subdivision (b) petition in which the Department sought to detain A.G. from Father's care. The Department reported that Father failed to drug tests on three separate occasions. Father also frequently failed to bring A.G. to Mother's scheduled visits on time.

On January 11, 2019, the juvenile court held a detention hearing on the amended petition. The juvenile court made temporary detention findings and orders and continued the detention hearing to the date of the combined jurisdiction/disposition hearing on January 14, 2019.

On January 14, 2019, the juvenile court held a combined jurisdiction/disposition hearing and a detention hearing on the amended petition. The juvenile court again continued the combined jurisdiction/disposition hearing to February 11, 2019, but ordered A.G. detained with the caretakers where A. had been placed.

On February 11, 2019, the juvenile court held a combined jurisdiction/disposition hearing. Father requested that A.G. be returned to his care, which the juvenile court denied. The juvenile continued the matter to March 21, 2019.

On March 21, 2019, the juvenile court held a combined jurisdiction/disposition hearing, which neither Father nor Mother attended. The Department reported that Father failed to participate in services, returned a positive drug test, and subsequently failed to drug test twice. The juvenile court continued the matter to May 6, 2019.

On May 6, 2019, the juvenile court held a combined jurisdiction/disposition hearing. Again, neither Father nor Mother were present for the hearing. The Department again reported that Father failed to participate in services, and failed to drug test. The juvenile court found the allegations in the amended petition true and ordered A.G. removed from Father and Mother. A.G. was placed in foster care.

In November 2019, the juvenile court held a section 366.21, subdivision (e) six-month status review hearing, which Mother and Father attended. The Department recommended that reunification services be terminated and that the trial court set a section 366.26 hearing to establish a permanent plan of adoption for A.G. and A.

The Department reported that A.G. had issues regulating his emotions, threw tantrums, and sometimes acted aggressively toward A., who had been placed in the same foster home as A.G. A.G. had bonded with his foster parents, who he called "mom" and "dad." The Department also reported that the foster parents were committed to adopting A.G. and A.

At Mother's request, the juvenile court set the hearing for a contest, which was scheduled for January 22, 2020. Father did not show up to the hearing. The Department reported that Father continually failed to visit A.G. The juvenile court terminated

4

reunification services and set the matter for a section 366.26 hearing to determine A.G.'s permanent plan.

In preparation for the section 366.26 hearing, the Department submitted a report recommending that the juvenile court terminate Father's parental rights to A.G. and free A.G. for adoption. The Department reported that A.G.'s foster parents had difficulty with his aggressive behavior toward A., but that he had been receiving therapy to improve his behavior. A.G.'s foster mother reported that she was pregnant and feared that A.G. might be aggressive toward her expected child. Because of his behavior, A.G.'s therapist recommended that A.G. be placed in intensive foster care.

In response, A.G.'s social worker called his foster mother, who stated that she could not meet A.G.'s needs and asked that he be placed elsewhere. The social worker told A.G.'s foster mother that doing so could jeopardize A.'s placement. To address A.G.'s foster mother's concerns, the social worker held a Children and Family Team (CFT) meeting. After the meeting, the social worker had "no doubt that [A.G.'s foster parents] are committed to adopting both [A.G. and A.]."

In June 2020, the juvenile court held a contested section 366.26 hearing, which Father attended. At the contested hearing, the juvenile court found that A.G. was adoptable and no exception to adoption had been established. The juvenile court therefore terminated Father's parental rights and freed A.G. for adoption. Father timely appealed.

III.

DISCUSSION

Father's only argument on appeal is that the juvenile court erroneously found that A.G. was adoptable. He contends A.G. was not adoptable because of his behavioral issues. We conclude substantial evidence supports the juvenile court's finding that A.G. was adoptable given that his foster parents were "committed" to adopting him.

At a section 366.26 hearing, the juvenile court selects and implements a permanent plan for the dependent child. (*In re K.P.* (2012) 203 Cal.App.4th 614, 620.) These include (1) adoption, necessitating termination of parental rights, (2) guardianship, or (3) long-term foster care. (§ 366.26, subds. (c)(1), (4)(A); *In re J.C.* (2014) 226 Cal.App.4th 503, 528.) If the court finds the child is adoptable, it "'shall terminate parental rights'" and select adoption as the child's permanent plan, unless it finds that one or more exceptions to the statutory adoption preference applies. (*In re K.P.*, *supra*, at p. 620; see § 366.26, subd. (c)(1)(A)-(B).) We review the record to determine if there is substantial evidence from which a reasonable trier of fact could find by clear and convincing evidence that the child was likely to be adopted within a reasonable time. (*In re J.W.* (2018) 26 Cal.App.5th 263, 267.)

Father contends there was no such substantial evidence because A.G.'s foster parents expressed reservations about adopting him because of his behavioral issues. In Father's view, A.G.'s "serious behavioral issues . . . make it difficult to find a family willing to adopt him." We disagree.

6

Father notes that A.G.'s foster mother told the Department that she could not meet A.G.'s needs and asked him to be placed with another foster family. But after holding a CFT meeting with A.G.'s foster mother, the social worker indicated in a section 366.26 report that she had "no doubt that [A.G.'s foster parents] are committed to adopting [A.G. and A.]." The social worker further stated that A.G. and A. "are appropriate children to be adopted due to their ages . . . and due to their current caregivers' willingness to pursue legalizing the parental relationship to the child through adoption. Adoption by their caregivers will provide the children with a stable permanent home." The social worker therefore recommended that A.G. and A. "be freed from their birth parents in order to be placed for adoption" with their foster parents, who are "committed to [A.G. and A.'s] long-term care."

There is no evidence in the record that the social worker's assessment changed between the time of the CFT meeting and when Father's parental rights were terminated a few months later. There is likewise no evidence to suggest that A.G.'s foster parents were not "committed to adopting [A.G.]" at the time of the section 366.26 hearing because of A.G.s behavioral issues, as Father contends. Rather, the social worker explicitly recommended that A.G. and A. be freed for adoption because their foster parents were "committed to adopting" A.G. and A. and "committed to their long-term care."

Moreover, "there is no indication [A.G.'s] behavioral problems were so severe as to make the court's finding of adoptability unsupported," as Father argues. (*In re Lukas*

7

*B.* (2000) 79 Cal.App.4th 1145, 1154.) Despite A.G.'s behavioral issues, which have improved, his foster parents are still "committed" to adopting him, which shows that he is likely to be adopted within a reasonable time. (See *In re R.C.* (2008) 169 Cal.App.4th 486, 492 ["R.C.'s caregivers are aware of his challenges and nevertheless remain committed to adopting him. From this, a reasonable inference can be drawn that R.C.'s age, physical and emotional condition and other personal attributes are not likely to dissuade individuals from adopting him."].) Accordingly, there was substantial evidence to support the trial court's finding by clear and convincing evidence that A.G. was likely to be adopted within a reasonable time. (See *In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1650 ["[A] prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family.*"]; *In re Marina S.* (2005) 132 Cal.App.4th 158, 165 ["[T]he fact that [minor's grandparents] were interested in adopting [her] by itself constitutes evidence that she was likely to be adopted."].)

Father nonetheless contends the juvenile court erred in finding A.G. was adoptable. In support, he relies on *In re Asia L.* (2003) 107 Cal.App.4th 498, which he argues is "analogous." We disagree. In *Asia L.*, the child's foster parents stated they were only "willing to explore adoption of the children," but thought it was "too soon for them to make such a permanent and life changing decision" at the time parental rights were terminated. (*Id*. at p. 511.) Thus, there was "'no identified prospective adoptive parent'" when the juvenile court terminated parental rights and freed the child for

adoption. (*Ibid*.) Because the child's "foster parents' *willingness to explore the option* of adopting [her] [was] too vague to be considered evidence that some family, if not this foster family, would be willing to adopt [her]," the *Asia L.* court held that the juvenile court erred in finding that she was likely to be adopted within a reasonable time. (*Id*. at p. 512, italics added.) Here, unlike the foster parents in *Asia L.*, A.G.'s foster parents were not simply willing to explore the option of adopting A.G. They are "committed" to adopting him and "committed to [his] long-term care."

Father also relies on *In re Amelia S.* (1991) 229 Cal.App.3d 1060, to support his argument that A.G. was not adoptable. *Amelia S.* does not support Father's position. There, the juvenile court terminated parental rights to nine of the father's 10 children, all of whom had "various developmental, emotional and physical problems, some of a serious nature." (*Id*. at p. 1063.) The children were in five different foster homes, and two sets of foster parents were "considering " adoption, while the three other sets of foster parents did not want to adopt the children. (*Id*. at pp. 1062-1063.) The *Amelia S.* court thus held there was insufficient evidence to support the juvenile court's finding that it was likely the children would be adopted within a reasonable time. (*Id*. at p. 1065.) By contrast, here, A.G.'s foster parents not only expressed a desire to adopt him, but a social worker had "no doubt" that they were "committed" to doing so and "committed" to his long-term care.

Relying on *In re Valerie W.* (2008) 162 Cal.App.4th 1, Father also claims the juvenile court erred because the Department's section 366.26 report was insufficient.

9

*Valerie W.* is distinguishable. In that case, Vera and her adult daughter, Juana, sought to adopt two siblings. (*Id.* at p. 4.) The juvenile court terminated parental rights the children and freed them for adoption by Vera only, even though "neither the [San Diego County Health and Human Services Agency] nor Vera and Juana intended to proceed with Vera as the children's sole adoptive parent." (*Id.* at p. 15.)

The *Valerie W.* court held the juvenile court erred in doing so because it lacked critical information, including: (1) whether Juana would qualify as an adoptive parent; (2) whether Vera would adopt the children if Juana could not do so; (3) whether Vera or Juana would adopt the children if their proposed joint adoption were not approved; (4) information about one of the children's medical needs; and (5) evidence about Vera and Juana's social history, their relationship with the children, and their motivations for adopting the children. (*In re Valerie W.*, *supra*, 162 Cal.App.4th at pp. 13-15.) Further, the juvenile court failed to consider whether Vera and Juana could legally adopt the children as mother and daughter, which the *Valerie W.* court questioned and directed the trial court to consider in the first instance on remand. (*Id.* at p. 16.)

Father contends that, as in *In re Valerie W.*, *supra*, 162 Cal.App.4th 1, the Department's section 366.26 report was insufficient. He argues the report "did not contain information about the eligibility and commitment of the foster parents, a description of the relationship between the child and the foster parents, the foster parents' motivation for seeking adoption, the capability of the foster family to meet the child's

10

needs, as well as whether the department made other efforts to identify additional prospective adoptive families." We disagree.

As we noted, the Department explained in its section 366.26 report that A.G.'s foster parents represented that they are "committed" to adopting him, and there is no indication they are unqualified to adopt the children. In fact, the Department stated in the report that A.G.'s foster parents have cared for him for over a year, have always met his needs, and are capable of doing so in the future. The Department also stated that A.G.'s foster parents have cared for him and A. because they "have always had a heart to care for children in the foster care system and have a desire 'to be open arms for other kids.'"

Finally, we reject Father's contention that the juvenile court prejudicially erred because the Department's section 366.26 report did not identify "whether the [D]epartment made other efforts to identify additional prospective adoptive families." For one thing, the Department was not required to do so. (See *In re I.I.* (2008) 168 Cal.App.4th 857, 870 ["Here, the willingness of M.A. and J.C. to adopt supports the finding of adoptability. Since it is not even necessary that one prospective adoptive home be identified before a child may be found adoptable, a fortiori, it is not necessary that backup families be identified."].)

But even if the Department were required to consider additional prospective adoptive families, we conclude the error, if any, was harmless. "Deficiencies in an assessment report surely go to the weight of the evidence, and if sufficiently egregious may impair the basis of a court's decision to terminate parental rights." (*In re Crystal J.*

11

(1993) 12 Cal.App.4th 407, 413.)  As we explained, the juvenile court's finding that A.G. is adoptable is supported by substantial evidence given that his foster parents are "committed" to adopting him.  As a result, the Department's error, if any, in failing to identify additional prospective adoptive families for A.G. is not so sufficiently egregious as to undermine the juvenile court's decision to terminate Father's parental rights to A.G. or its finding that A.G. was adoptable.  (See *In re Michael G.* (2012) 203 Cal.App.4th 580, 591 [error in section 366.26 report was harmless because substantial evidence supported juvenile court's finding that minor was adoptable].)

We therefore affirm the juvenile court's order terminating Father's parental rights to A.G. and freeing A.G. for adoption.

IV.

DISPOSITION

The juvenile court's order terminating Father's parental rights to A.G. and freeing A.G. for adoption is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
Acting P. J.

We concur:

SLOUGH
J.

FIELDS
J.

12