Filed 1/31/14  In re A.G. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.G. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E059089 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J234539, J234540 & J234541) |
| v. | OPINION |
| J.G., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Cheryl S. Kersey, Judge.  Affirmed.

Siobhan M. Bishop, under appointment by the Court of Appeal, for Defendant and Respondent.

Jean-Rene Basle, County Counsel, and Jamila Bayati, Deputy County Counsel, for Plaintiff and Respondent.

1

I

INTRODUCTION

Mother appeals the juvenile court's order terminating parental rights to her son, T.G. (almost nine years old), and daughters, S.G. (eight years old) and A.G. (six years old). She also challenges the court's order denying her Welfare & Institutions Code[1] section 388 petition to change the court's order terminating reunification services and setting a section 366.26 hearing.

Mother contends there was insufficient evidence to support findings that the children were adoptable and that CFS had complied with heightened ICWA[2] requirements. Mother also argues the juvenile court erred in summarily denying her section 388 petition and in not applying the beneficial parent relationship exception to termination of her parental rights. We reject mother's contentions and affirm the judgment.

II

FACTS AND PROCEDURAL BACKGROUND

On August 17, 2010, San Bernardino County Children and Family Services (CFS) received an anonymous referral for sexual abuse and general neglect regarding A.G.,

---

[1] Unless otherwise noted, all statutory references are to the Welfare & Institutions Code.

[2] Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.).

S.G., and T.G. (the children). At that time, the children were three, four, and five years old, respectively. They were currently living with mother and their father (father). The referral provided CFS with a cell phone photograph, taken on father's phone, of a child sleeping with her face next to a penis (the cell phone incident).

During CFS's investigation of the cell phone incident, mother stated during an interview that her three older children, who were not father's children (the older children), had all been sexually molested by father's sons, Z.G. and An.G. As a result, the three older children went to live with their father out of state. At the time of the cell phone incident, the older children were visiting mother and had been living with their father for about five years. Z.G., who was 15 years old, was also visiting but was staying nearby with his brother, An.G., who was 18 years old. Mother identified the child in the cell phone photograph as one of her older children.

Father stated during his interview that when he found out Z.G. had abused mother's older children, he "whooped his ass" and put him in counseling until Z.G. went to live with his mother out of state. Mother initially did not want Z.G. around her children but ultimately allowed him to visit. The children reportedly continued to have regular contact with Z.G.

Police officer Whitecross, who investigated the cell phone incident, reported that the family's home was filthy and uninhabitable. There was very little food in the house. The children were dirty and unkempt. T.G. had chopped off S.G.'s hair while it was in a pony tail and T.G.'s teeth were rotted, black and broken. T.G. had not been registered for

3

school and A.G.'s immunizations were not up to date. Mother suspected T.G. might be bipolar because of his aggressive behavior and mood swings.

Mother stated during her interview that she was diagnosed with bipolar disorder when she was 14 years old, was currently depressed, and was not taking any medication. Father had been an alcoholic and used drugs many years ago, but mother believed he no longer used drugs, other than occasionally using marijuana. Father was recently laid off from his job he had held for 13 years. Mother and father had previously separated because they were continually fighting, but had recently reunited. S.G., T.G., and mother's two older daughters, El.W. and M.W., said that father hit mother, but mother denied it.

On August 24, 2010, at 2:00 a.m., CFS removed the children from mother and father's care and placed them in foster care. CFS found Z.G. was in the home, and T.G. and A.G. were still awake and filthy. CFS filed juvenile dependency petitions, alleging the children (A.G., S.G., and T.G.) came within section 300, subdivisions (b) (failure to protect), (d) (sexual abuse), and (j) (abuse of sibling). CFS alleged that mother and father (parents) failed to provide the children with adequate medical care, housing, food, and clothing; parents had substance abuse problems and engaged in domestic violence; mother suffered from bipolar disorder; and parents allowed known sexual abuse perpetrators in the family home, and failed to protect S.G. from being sexually molested by mother's older child, M.W.

At the detention hearing, the juvenile court ordered the children detained in foster

4

care, ordered parents to submit to drug testing, and ordered CPS to provide parents with reunification services and supervised visitation a minimum of once a week, for one hour. Parents indicated they might have Cherokee Indian ancestry.

**Jurisdiction/Disposition Hearing**

During an interview on August 27, 2010, mother's older son, Et.W., and daughter, El.W., told the social worker that mother and father smoked "white powdery stuff" in a glass pipe all the time, and others would join them. The two children also said there were lots of spiders everywhere in their home and they had to get most of their clothes and food out of the trash. There was never any food, hot water, toothpaste, or toilet paper in the house. T.G. ran around the house with knives, stabbing the other children. Mother did nothing to stop him. El.W. and Et.W. showed the social worker many of their scars from being cut. T.G. also cut off S.G. and A.G.'s hair with a razor blade while S.G. and A.G. were sleeping. S.G. had head lice.

CFS's jurisdiction/disposition report filed on September 15, 2010, stated that mother denied domestic violence with father, but the children confirmed it had occurred. Mother's older children reported that mother and father were heavy methamphetamine smokers, which parents denied. S.G. and A.G. reported that T.G. had punched, hit, stabbed and pushed them. T.G had tried to cut S.G.'s throat with a knife. According to the children, parents forced T.G. to watch horror movies and told him to act like the people in the movies. The children said parents used corporal punishment, including spanking them with their hands and a belt, and threw them into their rooms or onto the

5

couch. Parents denied this. Father said Z.G. was staying with parents because Z.G. had a fight with his brother, An.G., and they could not put him out on the street. The social worker reported that, although parents had cleaned their home, the underlying problems of substance abuse, interfamilial sexual abuse, domestic violence, and poor parenting skills needed to be addressed before the children could return to parents' care.

At the jurisdiction/disposition hearing in September 2010, the court set mediation, a pretrial settlement conference, and trial. Parents contested the need for participating in a domestic violence program and substance abuse treatment. The court set a contested jurisdiction/disposition hearing. Parents reportedly avoided drug testing and took little responsibility for their children's removal.

At the contested jurisdiction/disposition hearing in November 2010, the court found most of the petition allegations true. The court ordered the children removed from parental custody, authorized weekly supervised visitation and ordered reunification services for parents. The court also found that the children came within ICWA, that CFS had initiated compliance with ICWA notice requirements, and that T.G. was suffering from severe emotional damage, reflected by his aggressive behavior toward himself and others. The court authorized CFS to have T.G. referred for therapy and evaluated by SART (Sexual Assault Response Team).

**Six- and Twelve-Month Review Hearing**

On November 29, 2010, the Cherokee Nation notified CFS that the children were eligible for enrollment and affiliation with the Cherokee Nation but the Cherokee Nation

6

could not intervene in the dependency case until the children became members of the Cherokee Nation. At a nonappearance hearing in December 2010, the juvenile court found that notice was provided as required under ICWA.

CFS reported in its six-month status review report, filed in May 2011, that mother had not used referrals provided for outpatient drug treatment services or classes on parenting, domestic violence or sexual abuse. Mother, however, visited the children weekly and the visits went well. Shortly before the May 2011, six-month hearing, mother started reunification services. She completed an online parenting class, which was not approved by CFS, and an anger management class. At the six-month hearing, the court ordered CFS to continue providing mother with reunification services and authorized liberalized visitation for mother.

CFS reported in its 12-month status review report, filed in November 2011, that mother had not fully complied with her case plan and had not attended random drug testing. Mother had been residing in various homes with friends and at a homeless shelter. Mother continued regularly to visit the children. At the 12-month review hearing in November 2011, the court found that CFS had provided reasonable services and ordered continued services.

**Eighteen-Month Review Hearing**

CFS recommended in its 18-month status review report, filed in February 2012,

that the court terminate reunification services and set a section 366.26 hearing. CFS reported that mother was admitted to the MFI[3] Recovery Center (MFI) in December 2011, for substance abuse and other behavioral issues. She was scheduled to complete the program in March 2012. Parents were residing with father's brother, whose home was unsuitable for the children because relatives who were on parole lived there. Father had three warrants for his arrest, including a warrant issued in December 2011, for driving without a license, concealed firearms, and failure to appear. Neither parent had enrolled in sexual abuse counseling. Mother continued weekly, supervised visits with the children. The children were doing well in their foster home and the caretaker was willing to adopt the children.

Mother completed in January and February 2012, a parenting education course and aftercare treatment at MFI. Mother's MFI counselor reported in January 2012 that mother was making good progress. However, in February 2012, mother failed to appear in criminal court for a probation revocation hearing, resulting in the court issuing an arrest warrant.

At the 18-month review hearing on March 27, 2012, mother's attorney reported that since the last hearing, mother had participated in and completed a drug treatment program, finished a CFS approved parenting class, continued to visit the children, was enrolled in college, with perfect attendance and close to a 4.0 college grade point

---

[3] My Family, Inc.

average, and had a job working for the college. However, parents continued to live with father's brother. Therefore parents' home was unsuitable for the children. Mother reported she had secured an apartment but could not move in until the first of April. Mother's attorney requested the court extend reunification services based on a finding of exceptional circumstances, because mother had made a lot of progress during the past three months.

CFS's attorney argued that mother's progress in reunifying was very recent. She had a long, serious history of substance abuse and had not been free from substance abuse for very long. Mother had not participated in sexual abuse counselling and did not have suitable housing for the children. In addition, parents did not provide evidence that they entered into a rental agreement with a specific landlord. They provided only an agreement with a rental service agency, which searches for homes for parents by sending their information to landlords. Mother's attorney provided the court with the address of an apartment mother intended to rent.

The juvenile court found that there were not exceptional circumstances. Parents had made progress in the last couple months but that was not enough to extend reunification services. They still needed to complete counselling and, even assuming parents moved into an apartment the first of the month, there was no evidence it was appropriate housing. In addition, parents had only recently completed their outpatient drug treatment program and the court did not have sufficient test results for parents. The court found that parents had been provided with adequate reunification services and

9

failed to complete their court-ordered case plan.  The court terminated services, set a section 366.26 hearing, and ordered supervised visitation continue once a week, for one hour, with authorization for CFS to liberalize frequency and duration of visitation.  The court also authorized unsupervised visits as appropriate.

**Section 388 Petition and Section 366.26 Hearing**

CFS reported in its section 366.26 hearing report, filed in July 2012, that T.G., who was entering second grade, had difficulty listening, was aggressive with his siblings and others, and called people bad names.  S.G., who was entering first grade, was doing well academically and had no behavioral problems at school but exhibited anxiety, including twisting and ripping paper into small pieces, and pulling apart toys.  A.G. was entering kindergarten.  She was doing well in Head Start and had no noted behavioral problems at school.  The children appeared healthy and did not exhibit problems sleeping or eating.  They were meeting their developmental milestones.  CFS referred the children to therapy to address behavioral issues and ease the transition to adoption.

The social worker reported that mother "was not real interactive" with the children.  During a visit in April 2012, the children frequently hit each other and threw toys.  Mother did not attempt to stop them or attempt to correct their inappropriate behaviors.  The children reportedly were not upset when visits were cancelled.  The CFS social worker concluded that, although the children had mild emotional/behavioral issues, they were adoptable and finding an adoptive home for them was likely.

CFS further reported that in July 2012, the children were enrolled with the

Cherokee Nation Tribe. As a consequence, the section 366.26 hearing was continued to October 2012 to allow the tribe to intervene and identify a concurrent planning home for the children. In September 2012, the Cherokee Nation intervened in the case, after determining the children were "Indian" children under ICWA. Cherokee Nation Tribe Social Worker, Amanda Neugin, attended the subsequent hearings by telephonic appearance.

On February 1, 2013, T.G. was moved to a respite care home due to his behavioral issues. He was hurting himself and his siblings, was suspended from school, and was out of control during a visit with mother. After T.G. was placed in the respite home, which provided T.G. with a strong father figure, T.G.'s tantrums improved but he continued to be disrespectful to women. S.G. and A.G. said they enjoyed seeing T.G. but felt safer when he was gone. T.G.'s respite home became his placement. T.G.'s new foster mother reported that T.G. was sexually acting out on a three-year-old foster child in the home.

CFS reported in an addendum report filed on May 7, 2013, that the tribe had located a Cherokee adoptive home for the children. The CFS social worker concluded that the children were adoptable since they were healthy, attractive, and intelligent, and a family was willing to adopt them. T.G. exhibited behavioral issues but his behavior had greatly improved recently. S.G. and A.G. had minimal issues. The Cherokee Nation conducted an adoption home study of a prospective adoptive family's home and approved the home. CFS found the study suitable and recommended the court terminate parental rights and permit the prospective Indian family to adopt the children.

11

At the contested section 366.26 hearing on May 7, 2013, the Cherokee Nation submitted a declaration of Indian expert witness, in which Amanda Neugin stated that CFS had complied with ICWA during the past 32 months. Parents had been offered reunification services since 2010. Parents failed to comply with their case plans, did not maintain appropriate housing for placement of the children in their care, and did not address their outstanding warrants. Therefore services were terminated. Neugin concluded in her declaration that CFS provided parents with reasonable services and made active efforts to provide remedial services to prevent the breakup of the family. Those services were unsuccessful. Neugin further concluded custody by parents would likely result in serious emotional or physical damage to the children. The Cherokee Nation had found a Cherokee adoption home for the children and was working on placing the children in the home as soon as possible. The Cherokee Nation recommended terminating parental rights.

On May 7, 2013, CFS social worker Mary Charrey filed a statement of additional information, also recommending the court terminate parental rights and proceed with adoption by the Cherokee prospective adoptive family, which wished to proceed with adoption. Charrey concluded the children were adoptable. S.G. and A.G. had resided with their current foster family since August 24, 2010, and T.G. had resided in his current foster home since February 25, 2013. The children were confused and stressed by the prospect of moving to a new adoptive home. Charrey would assist the children in transitioning to their new home.

The section 366.26 hearing on May 7, 2013, was continued to the following day, to allow Neugin to provide testimony by Face Time. Mother's attorney informed the court that mother intended to file a section 388 petition. The court responded that mother's section 388 petition was not timely. Nevertheless, on May 7, 2013, mother filed a section 388 petition, requesting modification of the order terminating reunification services and requesting return of the children to her or, alternatively, reinstatement of reunification services and liberalized visitation.

On May 8, 2013, CFS social worker, Sandy Parker, filed an additional information report, responding to mother's section 388 petition. Parker stated that parents had remained inconsistent in their treatment and goals. They were frequently transient and did not complete their programs until February 2012, a month before termination of reunification services. They still had not obtained suitable housing for the children. After services were terminated in March 2012, mother continued her schooling and worked at the college but did not provide CFS with a residence address. In December 2012, CFS discovered mother was again living in an uninhabitable home, in squalor, without electricity, gas or water. Mother had continued to visit the children but her interaction with them had been "somewhat emotionless" and the parents often had little control over the children. Father's visitation with the children ended after CFS received a referral in September 2013, alleging he sexually abused the children, and the sexual abuse allegations were substantiated.

CFS reported that mother had been visiting the children with a man who had a

13

long criminal record, admitted to being a gang member, and had an outstanding warrant. Mother also had not attempted to clear an outstanding $100,000 warrant for larceny, which had been active since December 2011.

At the contested section 366.26 hearing on May 8, 2013, the court summarily denied mother's section 388 petition, without a hearing, concluding there was no evidence of any change of circumstances. The court further conducted the contested section 366.26 hearing. Indian expert witness, Amanda Neugin, testified that she believed the children were adoptable and she was ready to place the children for adoption with an Indian family. Neugin further testified that CFS had made active efforts in compliance with ICWA and that returning the children would likely result in serious emotional or physical harm.

Mother testified she had visited the children every Friday, initially for one hour and then later on for two hours. She was currently visiting the children once a week but recently had missed a couple visits. Mother stated that the children showed her physical affection by running and jumping on her. When she picked them up, they would tell her they loved her and missed her, and they wanted to know when they were returning home with her. The children called her "mommy" and T.G. called her every night before bedtime and told her he prayed they would be together again. Mother testified that "Our visits have been perfect," although she acknowledged that, during the visits, the children hit each other and T.G. threw toys across the room because he was mad. Mother claimed she did not punish the children because the foster parent told her not to. One time T.G.

14

said he wanted to die and bit chunks out of his shirt because it had been awhile since his dad had visited him. Mother acknowledged that she was engaged to the man who had accompanied her to visits. When asked if she knew her companion was a gang member, mother said he probably had been but was not currently active in a gang. When mother was told she had an outstanding warrant against her, she said she would take care of it the following morning.

After hearing testimony and argument, the juvenile court ruled the beneficial parental relationship exception to adoption did not apply because "visitation has not escalated or improved to an actual bond with the children." Although the children enjoyed seeing her, as a friendly visitor, mother did not hold a parental role. The court further found the children would be adopted and that returning the children to parents likely would result in serious harm to the children. The court terminated parental rights.

III

FORFEITURE OF SUFFICIENCY OF EVIDENCE OBJECTIONS

Mother contends there was insufficient evidence the children were adoptable or that CFS complied with the heightened ICWA standards necessary for terminating her parental rights. Citing *In re Crystal J.* (1993) 12 Cal.App.4th 407 (*Crystal J.*), CFS argues that mother forfeited her sufficiency of evidence objections by not raising them during the contested section 366.26 hearing. Based on the rationale succinctly stated in *In re Brian P.* (2002) 99 Cal.App.4th 616, 622-623 (*Brian P.*), we conclude no objection was necessary to preserve mother's sufficiency of evidence challenge.

15

In *Brian P.*, the court rejected the father's contention there was insufficient evidence of adoptability. The court noted: "A similar waiver argument was raised in *In re Lukas B.* (2000) 79 Cal.App.4th 1145. The court decided to consider the issue of adoptability . . . , but observed there was authority that would support deeming the issue waived. [Citations.] [¶] Of the cases cited by the *Lukas B.* court, only *Crystal J.* actually supports the proposition that the ultimate issue of whether the child is likely to be adopted can be waived by failing to argue the point at the section 366.26 hearing." (*Brian P., supra,* 99 Cal.App.4th at pp. 622-623.)

We agree, as concluded in *Brian P.,* that "the *Crystal J.* court overstated the scope of the waiver doctrine. . . . [¶] When the merits are contested, a parent is not required to object to the social service agency's failure to carry its burden of proof on the question of adoptability. (See *In re Chantal S.* (1996) 13 Cal.4th 196, 210 [agency has burden of presenting evidence to support allegations and requested orders]; [citation].) 'Generally, points not urged in the trial court cannot be raised on appeal. [Citation.] The contention that a judgment is not supported by substantial evidence, however, is an obvious exception to the rule.' [Citations.] Thus, while a parent may waive the objection that an adoption assessment does not comply with the requirements provided in section 366.21, subdivision (i), a claim that there was insufficient evidence of the child's adoptability at a contested hearing is not waived by failure to argue the issue in the juvenile court." (*Brian P., supra,* 99 Cal.App.4th at p. 623.)

In the instant case, under *Brian P.,* mother's objections on appeal to the

16

sufficiency of evidence of adoptability and ICWA findings, were not forfeited even though mother did not challenge the sufficiency of evidence on these issues in the juvenile court. (*Brian P., supra,* 99 Cal.App.4th at pp. 622-623; see also *In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1560-1561.)

IV

SUFFICIENCY OF EVIDENCE OF COMPLIANCE WITH

HEIGHTENED ICWA REQUIREMENTS

Mother contends the evidence was insufficient to support the juvenile court's finding of CFS compliance with the heightened ICWA standards necessary for terminating her parental rights.

A. *Sufficiency of Evidence Standard Applicable to Indian Children*

ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes and families by establishing minimum federal standards in juvenile dependency cases. (25 U.S.C. §§ 1901, 1902; *In re Robert A.* (2007) 147 Cal.App.4th 982, 988.) Those standards require the juvenile court to make certain findings affecting an Indian child before ordering foster care or terminating parental rights. Under ICWA and California state law, any party seeking termination of parental rights to an Indian child under state law "shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." (25 U.S.C. § 1912, subd. (d); see also § 366.26, subd. (c)(2)(B)(i) and § 361.7.) In addition,

17

the juvenile court may not order termination of parental rights "in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." (25 U.S.C. § 1912, subd. (f); see also § 366.26, subd. (c)(2)(B)(ii).) Mother argues the evidence was insufficient to satisfy these requirements.

"We review the court's findings made pursuant to ICWA for supporting evidence which is 'reasonable, credible and of solid value.' (*In re Michael G.* (1988) 63 Cal.App.4th 700, 715.) We review the record in a light most favorable to the judgment and uphold the trial court's finding unless it can be said that no rational factfinder could reach the same conclusion. (*Id.* at pp. 715-716.) The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the court's finding or order. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947; *In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 420.)" (*In re Barbara R.* (2006) 137 Cal.App.4th 941, 950.)

### B. *Evidence of Active Efforts to Provide Services*

Mother argues there was insufficient evidence that CFS made active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of parents' family and that these efforts proved unsuccessful. (25 U.S.C. § 1912, subd. (d); § 366.26, subd. (c)(2)(B)(i) and § 361.7.) The phrase "active efforts" means that "timely and affirmative steps be taken to accomplish the goal which Congress has set: to avoid the breakup of Indian families *whenever possible* by providing services designed to

18

remedy problems which might lead to severance of the parent-child relationship."

(*Letitia V. v. Superior Court* (2000) 81 Cal.App.4th 1009, 1016 (*Letitia V.*), italics added; see also *In re K.B.* (2009) 173 Cal.App.4th 1275, 1284 [Fourth Dist., Div. Two].) "What constitutes active efforts shall be assessed on a case-by-case basis. The active efforts shall be made in a manner that takes into account the prevailing social and cultural values, conditions, and way of life of the Indian child's tribe. Active efforts shall utilize the available resources of the Indian child's extended family, tribe, tribal and other Indian social service agencies, and individual Indian caregiver service providers." (§ 361.7, subd. (b).)

There is no established formula for distinguishing between active and passive efforts. (*In re K.B., supra,* 173 Cal.App.4th at p. 1287.) "However, the following is a useful guideline: 'Passive efforts are where a plan is drawn up and the client must develop his or her own resources towards bringing it to fruition. Active efforts . . . is where the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own. For instance, rather than requiring that a client find a job, acquire new housing, and terminate a relationship with what is perceived to be a boyfriend who is a bad influence, the Indian Child Welfare Act would require that the caseworker help the client develop job and parenting skills necessary to retain custody of her child.' [Citation.]" (*Id.* at p. 1287.) "Although the phrase 'active efforts' is not defined by either federal or state statute, California courts have construed 'active efforts' to be 'essentially equivalent to reasonable efforts to provide or offer reunification

19

services in a non-ICWA case . . . .' [Citations.]" (*In re C.B.* (2010) 190 Cal.App.4th 102, 134.)

"Whether active efforts were made is a mixed question of law and fact. [Citation.] We can determine what services were provided by reference to the record. Whether those services constituted 'active efforts' within the meaning of section 361.7 is a question of law which we decide independently. [Citation.]" (*In re K.B., supra,* 173 Cal.App.4th at p. 1286.)

In the instant case we conclude the juvenile court and CFS complied with ICWA's "active efforts" requirements. CFS provided parents with case plans. Mother's case plan required her to participate in sexual abuse counseling, parenting education, a domestic violence program, and substance abuse counseling, outpatient treatment, and drug testing. CFS assisted parents with complying with their case plans by providing them with referrals and resources, including counseling, courses in parenting, domestic violence, and substance abuse, substance abuse rehabilitation treatment, therapy, bus passes, gas cards, and housing assistance. CFS made appointments to meet with parents to assist them with compliance with their case plans. Although parents did not fully make use of the services offered, they used the gas cards and bus passes provided by CFS to visit their children. At both the six-month and 12-month review hearings, the court found that CFS had provided parents with reasonable services.

Following the 12-month hearing, CFS continued to assist mother in complying with her case plan so that she could reunify with her children. By the time of the 18-

20

month hearing in February 2012, CFS had provided parents with numerous reunification services. Mother had completed most of her substance abuse services but had not secured suitable housing for the children, even though the month before reunification services were terminated, CFS offered parents assistance with rent. At the March 2012 contested 18-month hearing, the court again found that CFS had provided parents with reasonable services designed to overcome the problems leading to the children's removal. The juvenile court terminated reunification services upon finding that parents had failed to make sufficient progress toward alleviating or mitigating the causes necessitating removal of the children.

Parents received over a year and a half of reunification services to assist parents in completing their case plans, which were designed to enable parents to reunify with the children. Cherokee Nation expert, Neugin, stated in her declaration and testified at the contested section 366.26 hearing on May 8, 2013, that CFS had provided parents with reasonable reunification services and had made "active efforts to provide remedial services to prevent the breakup of this Indian family and those services were unsuccessful."

The above enumerated evidence of CFS providing parents with 17 months of various reunification services was sufficient to support the juvenile court's finding that CFS made active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of parents' family and that these efforts have proved unsuccessful. (25 U.S.C. § 1912, subd. (d); § 366.26, subd. (c)(2)(B)(i) and § 361.7.)

21

*C. Evidence of Likelihood of Serious Emotional or Physical Damage*

Mother contends there was insufficient evidence that returning custody of the children to mother would likely result in serious emotional or physical damage to the children. (§ 366.26, subd. (c)(2)(B)(ii).) Mother argues that by the time of the section 366.26 hearing, she had completed outpatient substance abuse treatment and after care; had attended parenting, anger management, domestic violence, and sexual abuse prevention courses; was enrolled in college; was working full-time; and had filed for divorce from father. Mother notes that Indian expert, Neugin, likely did not know of mother's current situation reflected in mother's section 388 petition when Neugin concluded in her May 3, 2013 declaration that returning the children to mother's custody would result in serious emotional or physical harm to the children.

However, during the contested section 366.26 hearing on May 8, 2013, Neugin testified that her declaration dated May 3, 2012, reflected her current opinions and conclusions. Consistent with her declaration, Neugin stated that, in her opinion, if the children were returned to mother, they would suffer serious emotional or physical damage. There was no evidence presented at trial that Neugin was unaware of mother's current situation.

Furthermore, even assuming Neugin did not consider the evidence contained in mother's section 388 petition, it was unlikely this made any difference since there was substantial evidence supporting the finding that the children would suffer serious emotional or physical damage if returned to mother. Mother had not addressed issues of

22

domestic violence or the risk of the children being exposed to sexual abuse. She also had not established she could provide stable housing for the children and would put the children's needs before her own. She was engaged to a gang member who had a lengthy criminal history and had not addressed her own outstanding $100,000 arrest warrant. In December 2012, six months before the section 366.26 hearing, her older children had visited her when she was again living in an uninhabitable home, without electricity, gas, or water. This reflected that mother was still willing to live with her children in squalor, under unsuitable conditions. There was also some question as to mother's sobriety, since her last drug test results were in July 2012, almost a year before the May 2013 section 366.26 hearing. In addition, the CFS social worker reported in a supplemental report filed on May 8, 2013, that mother lacked nurturing qualities and her interaction with the children was "somewhat emotionless." Mother also lacked control over the children. Evidence of such circumstances was sufficient to support the court's finding that returning the children to mother would likely result in serious emotional or physical harm to the children.

V

SUFFICIENCY OF EVIDENCE OF ADOPTABILITY

Mother contends there was insufficient evidence to support the juvenile court's finding at the section 366.26 hearing that the children were adoptable. We disagree.

CFS had the burden of proving the children were adoptable. (*In re Gregory A.,* *supra,* 126 Cal.App.4th at pp. 1557, 1559-1561; *In re Josue G.* (2003) 106 Cal.App.4th

23

725, 732, quoting § 366.26, subd. (c)(1).) "Although a finding of adoptability must be supported by clear and convincing evidence, it is nevertheless a low threshold: The court must merely determine that it is 'likely' that the child will be adopted within a reasonable time. [Citations.]" (*In re K.B., supra,* 173 Cal.App.4th at p. 1292.) A finding of general adoptability "focuses on the minor, e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor." (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649, italics omitted.) A child's psychological, behavioral and developmental problems may make it more difficult to find adoptive homes, but do not necessarily prevent an adoptability finding. (*In re Lukas B., supra,* 79 Cal.App.4th at p. 1154; *In re Jennilee T.* (1992) 3 Cal.App.4th 212, 224-225; *In re I.I.* (2008) 168 Cal.App.4th 857, 870-871 [Fourth Dist., Div. Two].)

Even if an adoptive family is not readily available, the juvenile court may find a child generally adoptable. (*In re I.I., supra,* 168 Cal.App.4th at p. 870.) "The issue of adoptability posed in a section 366.26 hearing focuses on the *minor,* e.g., whether the minor's age, physical condition, and mental state make it difficult to find a person willing to adopt the minor. [Citations.] Hence, it is not necessary that the minor already be in a potential adoptive home or that there be a proposed adoptive parent 'waiting in the wings.' [Citations.]" (*In re Sarah M., supra,* 22 Cal.App.4th at p. 1649; *In re I.I., supra,* 168 Cal.App.4th at p. 870.) "However, the court must find by clear and convincing evidence that it is likely the child will be adopted within a reasonable time." (*I.I.,* at p. 870; *Brian P., supra,* 99 Cal.App.4th at p. 624.)

24

A child who is not generally adoptable may be specifically adoptable, that is, adoptable "because a prospective adoptive family has been identified as willing to adopt the child." (*In re Sarah M., supra,* 22 Cal.App.4th at p. 1650.) "[T]he fact that a prospective adoptive family has been identified is an indication that the child is likely to be adopted within a reasonable time. '"Usually, the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor. In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family.*" [Citation.]' [Citation.]" (*In re I.I., supra,* 168 Cal.App.4th at p. 870; *In re Asia L.* (2003) 107 Cal.App.4th 498, 510.)

Here, the willingness of a Cherokee Indian family to adopt the children supports the finding of specific adoptability. Mother argues that this is an insufficient basis for finding the children adoptable because the family had never met the children and T.G. had severe behavioral problems which resulted in his removal from the children's foster home. In addition, the children were part of a large sibling group, which made adoption more difficult. Mother argues that there was no showing that any other family was willing to adopt the children if the prospective adoption fell through or that the children were generally adoptable. But "[s]ince it is not even necessary that one prospective adoptive home be identified before a child may be found adoptable, a fortiori, it is not

25

necessary that backup families be identified." (*In re I.I., supra,* 168 Cal.App.4th at p. 870.)

Mother argues that, while the children may have been specifically adoptable, they were not generally adoptable, primarily because of T.G.'s serious behavioral problems. Three months before the contested section 366.26 hearing, he was removed from the children's original foster home because the foster mother could no longer handle him. Mother asserts there was no evidence the prospective adoptive family was aware of T.G.'s severe behavioral problems and would follow through with adoption of the three children.

Although T.G. was removed from the children's original foster home in February 2013, because of behavioral problems, there was nevertheless sufficient, credible evidence to support a finding that the children were generally adoptable and would be adopted within a reasonable period of time. The children had lived together in the same foster home for 23 months, indicating it was likely another family would be willing to adopt the sibling set. Furthermore, CFS reported in July 2012, that the children were healthy, had no chronic medical conditions, had met their developmental milestones, and enjoyed playing together. They were relatively young (ages six, seven, and eight when parental rights were terminated). S.G. and A.G. had few, if any, behavioral issues.

The CFS social worker and Indian expert both concluded the children, including T.G., were adoptable, even though they had mild emotional/behavioral issues. In addition, CFS reported that the prospective adoptive family had an approved adoption

home study completed by the Cherokee Nation. The CFS social worker reviewed the home study and found the home suitable for the children. The supplemental report contained personal information about the prospective adoptive parents, including their health, finances, education, employment, and home. CFS reported that the prospective adoptive family wanted to proceed with adoption of the children.

The CFS social worker further noted in the report that, although T.G. had been removed from his original foster home because of behavioral problems, "his behavior has greatly improved in the two months he has been in his current foster home. He no longer has out of control tantrums. He appears to respond well to having a strong father figure in the home. [T.G.] does continue to show some disrespect toward the foster mother and women in general. This is improving and it is believed the prospective adoptive parents are confident in their parenting abilities and will be able to redirect and handle any inappropriate behavior. The prospective adoptive mother has successfully assumed the role of step mother to her husband's children. Furthermore, the alleged incident of sexual acting out by [T.G.] was investigated and determined to be unfounded."

Based on the evidence in the record, we conclude that the juvenile court's finding of adoptability is supported by substantial evidence. We note that, even if adoption by the children's prospective adoptive family falls through, the children are not in danger of becoming orphans. Under the current statute, section 366.26, subdivision (i)(2), added in 2005, if a child has not been adopted after three years following the termination of parental rights, the child may petition the juvenile court to reinstate parental rights.

27

(Stats. 2005, ch. 640, § 6.5.)

VI

SECTION 388 PETITION

Mother contends the juvenile court erred in summarily denying her section 388 petition. She argues she made a prima facie showing of changed circumstances and that modification of the court's order was in the children's best interests.

*A. Applicable Law*

Section 388 allows a person having an interest in a dependent child of the court to petition the court for a hearing to change, modify, or set aside any previous order on the grounds of change of circumstance or new evidence. The petition must be verified and "set forth in concise language any change of circumstance or new evidence that is alleged to require the change of order or termination of jurisdiction." (§ 388, subd. (a)(1); Cal. Rules of Court, rule 5.570(a).) The petitioner must "make a prima facie showing to trigger the right to proceed by way of a full hearing. [Citation.]" (*In re Marilyn H.* (1993) 5 Cal.4th 295, 310; *In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.) There are two parts to the prima facie showing: The petitioner must demonstrate (1) a genuine change of circumstances or new evidence, and that (2) revoking the previous order would be in the best interests of the child. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 529.) "If the liberally construed allegations of the petition do not show changed circumstances such that the child's best interests will be promoted by the proposed change of order, the dependency court need not order a hearing." (*Anthony W.,* at p. 250; *In re Zachary G.*

28

(1999) 77 Cal.App.4th 799, 806.)

The court is given broad discretion to deny a hearing if the request for modification fails to state a change of circumstances or new evidence or fails to demonstrate that the requested modification is in the best interests of the child. (Cal. Rules of Court, rule 5.570(d)(1) & ( 2); *In re Zachary G.*, *supra,* 77 Cal.App.4th at p. 808.)

*B. Section 388 Petition Factual and Procedural Background*

Mother requested in her section 388 petition modification of the March 27, 2012 order terminating reunification services. She requested return of the children to her or, alternatively, reinstatement of reunification services and liberalized visitation. Mother alleged her changed circumstances included mother completing outpatient and aftercare programs, attending college, maintaining a full-time job, and attending sexual abuse prevention, domestic violence and parenting on line courses. Mother had also requested a restraining order against father and was in the process of divorcing him. Mother alleged granting her section 388 petition was in the children's best interests because she was "their mother who loves them more than anyone could possibly love them and they love me back." She believed the children would be happiest with her, and she would protect and care for them.

Attached to her section 388 petition were certificates from Summit Career College for perfect attendance and academic achievement (awarded between February 2012 and July 2012), college progress reports and attendance ledgers through June 2012, a

February 2012 recommendation letter from an instructor, certificates of completion, from

January 2012 through February 2012, for parenting and substance abuse programs, work

paystubs, negative drug test results for the period of December 2011 through July 2012

and a February 2012 letter from her MFI substance abuse treatment counselor, stating

that mother's prognosis was good because she was motivated to change her life and had

learned the tools for maintaining sobriety. Also attached was documentation showing

mother was employed by Summit Career College Inc. from April through July 2012. In

addition, there were copies of "Western Unionr Reloadable Prepaid Cards," totaling

$800, with a handwritten notation the payment was for a "deposit for house."

In CFS's response to mother's section 388 petition, filed on May 8, 2013, CFS

social worker, Sandy Parker, reported that, since the inception of the case in September

2010, parents remained inconsistent in their treatment and goals. They were frequently

transient and did not complete their programs until February 2012, a month before

termination of reunification services. After services were terminated in March 2012,

mother continued her schooling and worked at the college. When asked where she was

living, mother provided vague information and said she did not know what her address

was. When CFS investigated where mother was living in December 2012, CFS

discovered mother was living again in an uninhabitable home with two of her older

children. Mother had continued to visit the children but her interaction with the children

had been somewhat detached and she lacked control over the children. In addition,

mother was visiting the children with a man who had a long criminal record, admitted to

being a gang member, and had an outstanding warrant, even though mother was told the man was not to accompany her to visits.

At the contested section 366.26 hearing on May 8, 2013, mother requested a hearing on her section 388 petition. The court stated that it had reviewed mother's documents attached to her section 388 petition and "Everything is from, for the most part, 2012, so none of this is change of circumstances that would show prima facie." The court concluded that the petition essentially repeated what was presented when services were terminated. Therefore the court summarily denied mother's section 388 petition.

*C. Discussion*

Mother argues the juvenile court erred in summarily denying her section 388 petition without a hearing. She notes that when the juvenile court terminated reunification services on March 27, 2012, the court told her: "[P]arents are continuing on with their programs. And the court would invite you to continue to complete whatever you need to complete. Show that you've got housing. Show that you have a means of financial ability. Show that you've completed all your programs. And show that you have remained sober and not using drugs over the course of the next couple months. And, the court is confident that, that would be all the makings of a 388 petition for your respective request to the court to change the plan for the children."

Mother asserts that she established in her petition that she had met all these requirements. She attached to her section 388 petition, college certificates of perfect attendance and academic achievement, progress reports, a college instructor

31

recommendation letter, certificates of completion for parenting and substance abuse programs, work paystubs, negative drug test results, and a favorable letter from her substance abuse treatment counselor. Mother argues that, contrary to the juvenile court's conclusion there was no prima facie showing of changed circumstances, a significant portion of the evidence supporting her section 388 petition was from after the March 27, 2012 hearing terminating reunification services.

Although some of the evidence submitted with mother's section 388 petition, reflected activity after the March 27, 2012 hearing, there was no prima facie showing of changed circumstances. Most of the supporting evidence showed the same circumstances that existed when the court terminated reunification services. Mother was still going to school and working, as before, and she remained sober, as before. The only evidence of activity after the March 27, 2012 hearing consisted of college attendance and academic performance certificates, from the period of April 2012 through July 2012; continuing negative drug test results, from the period of April 2012 through July 2012; and continuing employment at the college.

The juvenile court reasonably concluded this evidence was not sufficient to establish a prima facie showing of changed circumstances, particularly when there was no evidence mother had attended sexual abuse counseling, completed a domestic violence program, or obtained suitable housing for the children. There was also no evidence of current sobriety. Mother completed her drug treatment programs shortly before the March 27, 2012 hearing, and the last drug test was in July 2012. Mother's section 388

petition also did not demonstrate that ordering additional reunification services or returning the children to her custody was in the children's best interests. Mother's section 388 petition did not show that her bond with the children was strong or that she had sufficiently addressed the problems that led to the children's dependency, including an uninhabitable home, risk of sexual abuse, and exposure to domestic violence. We therefore conclude the juvenile court did not abuse its discretion in denying a hearing on mother's section 388 petition and summarily denying the petition.

VII

BENEFICIAL PARENTAL RELATIONSHIP EXCEPTION

Mother contends the trial court erred in failing to apply the beneficial parental relationship exception to adoption. She argues she consistently visited the children and established that the children would benefit from continuing her relationship with them.

If a dependent child is adoptable, the juvenile court must terminate parental rights at the section 366.26 hearing unless the parent proves the existence of a statutory exception. (§ 366.26, subd. (c)(1); *In re Helen W.* (2007) 150 Cal.App.4th 71, 80.) One such exception exists if "[t]he parent[] [has] maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) A beneficial relationship is one that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) The existence of this relationship is determined by considering "[t]he age of the child, the

33

portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs . . . ." (*Id.* at p. 576.)

There is a split of authority on the standard of review for section 366.26 orders. Most courts apply the substantial evidence standard (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575), but at least one court has used the abuse of discretion standard (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351). Recently some courts have applied both standards, which we find to be appropriate here. A "juvenile court's decision whether an adoption exception applies involves two component determinations: a factual and a discretionary one. The first determination—most commonly whether a beneficial parental or sibling relationship exists . . . —is, because of its factual nature, properly reviewed for substantial evidence. [Citation.] The second determination . . . is whether the existence of that relationship . . . constitutes 'a compelling reason for determining that termination would be detrimental to the child.' [Citation.] This '"quintessentially" discretionary decision . . .' is appropriately reviewed under the deferential abuse of discretion standard. [Citation.]" (*In re K.P.* (2012) 203 Cal.App.4th 614, 622.) "On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*Autumn H.,* at p. 576.)

Examining the evidence in the light most favorable to the judgment, we conclude

34

that although mother visited regularly, the court's finding that the benefits of adoption outweighed the children's bond with mother was supported by substantial evidence and not an abuse of discretion. (*In re Autumn H., supra,* 27 Cal.App.4th at pp. 576-577; *In re Cristella C.* (1992) 6 Cal.App.4th 1363, 1373.) The juvenile court concluded the beneficial parental relationship exception did not apply because, although mother maintained regular visitation and contact with the children, "that visitation has not escalated or improved to an actual bond with the children." After termination of reunification services, mother continued visiting the children once a week, for one hour, at the CFS office. Mother testified that she also talked to T.G. every night on the phone.

Although mother had consistently visited the children, mother had never had unsupervised or extended visits and, according to the social worker, mother "was not real interactive" with the children during visits. During a recent visit in April 2012, the children frequently hit each other and threw toys. Mother did not attempt to stop them or attempt to correct their inappropriate behaviors. The children reportedly were not upset when visits were cancelled. CFS reported in its May 8, 2013 report, that mother had continued to visit the children but her interaction with the children had been "somewhat emotionless" and the parents often had little control over the children. In addition, the CFS social worker reported that mother had been visiting the children with a man who had a long criminal record and admitted to being a gang member. Even though mother was told she could not bring her companion to visits with the children, she did so, indicating she was willing to place her children at risk of abuse by others.

35

Mother has not established there were exceptional circumstances that required applying the beneficial parental relationship exception. Although mother consistently visited the children, her visits were brief and supervised, and mother did not currently hold a parental role in the children's lives nor was she closely bonded with the children. When the children were initially removed from mother's care, they were young (ages three, four, and five years old). By the time of the section 366.26 hearing in May 2013, they had been in foster care for nearly 33 months, which was a significant portion of their young lives. The court reasonably rejected the beneficial parental relationship exception, since the children's need for a permanent and stable home outweighed any benefit in maintaining the children's relationship with mother.

## VIII

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

RAMIREZ
P. J.

KING
J.

36