Filed 12/8/21  In re S.M. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re S.M., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>L.O.,<br><br>    Defendant and Appellant. | E077247<br><br>(Super. Ct. No. J259949)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

Michelle D. Blakemore, County Counsel, and Kaleigh L. Ragon, Deputy County Counsel, for Plaintiff and Respondent.

I.

INTRODUCTION

L.O. (Mother) appeals the juvenile court's order terminating her parental rights to her son, S.M. (born in 2009), and freeing him for adoption by his foster parents. We affirm.

II.

FACTUAL AND PROCEDURAL BACKGROUND

In January 2015, the San Bernardino County Children and Family Services (CFS) received a referral about Mother's five minor children, including S.M.[1] CFS's investigation revealed that S.M. and his siblings had been living with their maternal grandmother, A.C., for about five years, but she had not become their legal guardian. CFS learned that Mother had an extensive criminal record, a history of drug use, and was homeless. CFS also learned that the children's adult brother, J.G., lived with A.C. as well. J.G. had a substance abuse problem, hit his girlfriend in front of the children, and also punched his siblings.

Because of J.G.'s ongoing violent behavior, CFS obtained a detention warrant for the children in April 2015. The social worker learned that Mother had recently been arrested and was currently in jail. S.M.'s father's whereabouts were unknown.

---

[1] Mother's other children are not involved in this appeal.

In April 2015, CFS filed a Welfare and Institutions Code[2] section 300 petition on the children's behalf. The juvenile court ordered S.M. and his four minor siblings detained. The court also ordered visitation with Mother, A.C., and sibling visitation.

At the May 2015 jurisdiction/disposition hearing, the court ordered reunification services for Mother. The court also ordered supervised visitations with Mother and A.C.

In July 2015, CFS notified the juvenile court that S.M.'s foster parents requested a change in placement for S.M. and his two siblings because of their behavior. A month later, CFS reported that S.M. had another foster placement change because of his severe behavioral issues. S.M. was placed with a new foster home where he appeared to be transitioning well.

In its six-month review report, CFS reported that Mother had made little progress on her case plan and her visitations with the children were inconsistent. CFS recommended continued reunification services, which the juvenile court ordered at the six-month review hearing. Mother, however, was in custody in county jail.

In February 2016, CFS reported that S.M. had been accepted into wraparound services and had been in the same placement since July 2015. S.M. was in first grade and needed an Individual Education Program, but was otherwise on track developmentally. Mother was incarcerated and had not participated in any of her case plan services, and her only contact with her children was a few letters to them. CFS recommended terminating reunification services for Mother.

---

[2] All further statutory references are to the Welfare and Institutions Code.

3

At a May 2016 hearing, the juvenile court agreed with the recommendation, terminated services for Mother, and ordered continued foster care for the children with the goal of legal guardianship. The court also ordered visitations with A.C. and their adult sister.

In its October 2016 status report, CFS reported that Mother remained incarcerated with a release date in December 2016. Mother had been regularly corresponding with her children by writing letters and calls through the social worker. S.M. had been moved from his foster home due to substantiated allegations of neglect by his foster mother. S.M. also had been hospitalized "on a 5150 hold" (see § 5150). CFS reported that S.M. "ha[d] become more challenging, is resistant to following directions and presents depressed."

At an October 2016 hearing, the juvenile court appointed a guardian ad litem for S.M. to determine whether he had been abused at his previous foster home. His social worker reported that S.M. recently had been hospitalized on another "5150 hold" and would need a higher level of care upon his release. Mother had been released from prison and sought more liberalized visits, which the court granted.

Two months later, at Mother's request and with CFS's approval, the juvenile court reinstated reunification services for Mother. The court set a review hearing for June 2017 to review Mother's progress with her services.

In April 2017, CFS reported that Mother had stopped participating in services. Her drug testing and visits had also become sporadic. CFS thus recommended that the children remain in foster care. CFS reported that S.M.'s behavior while in a group home remained concerning. He was disruptive in class and acted aggressively. Although some of his problematic behaviors were improving, CFS reported that his placement remained appropriate because he was not prepared for a less restrictive environment. The juvenile court ordered S.M. to remain in his current placement.

In June 2017, CFS recommended terminating services for Mother again. Mother did not participate in her case plan and inconsistently visited the children, which negatively affected them. S.M. was particularly affected by Mother's failure to visit him, and began bedwetting on nights where Mother missed a visit.

At a contested hearing in July 2017, the juvenile court terminated Mother's reunification services. The court ordered the children to remain in foster care and set a permanent plan review hearing for January 2018.

In January 2018, it was reported that some of S.M.'s behavioral issues (temper tantrums) had improved with medication. CFS noted that Mother had not contacted CFS. She missed all of her visits in August and September and had limited contact with the children. CFS reported that S.M. had made friends, but continued to have other

5

behavioral issues. S.M.'s placement in a group home remained appropriate because of his ongoing issues with impulse control, property damage, aggression, defiance, and harm to others. The juvenile court ordered S.M. to remain at the group home at a January 2018 hearing.

Between then and October 2019, S.M. remained in a group home. Although he continued to have behavioral issues, he showed improvement. In October 2019, CFS reported that S.M. was ready to be transitioned to a foster home.

By April 2020, S.M. had been placed in a foster home, but he struggled with the transition. He had two major temper tantrums, threatened to run away, and threatened to hurt his foster family. At the foster family's request, S.M. was moved to another foster home on April 27, 2020, because of his behavior. While with that foster family, S.M. was twice hospitalized on a section 5150 hold after threatening to hurt himself. Because that family was no longer willing to foster him, S.M. was returned to a group home on June 11, 2020.

In June 2020, S.M. threatened to harm himself because other children bullied him. He was again hospitalized on a section 5150 hold.

On August 14, 2020, S.M. was placed with foster parents Mr. and Mrs. H. Mrs. H. worked at S.M.'s first group home and contacted CFS to ask about his placement. While at the group home, Mrs. H. became familiar with S.M.'s needs and helped him to stabilize at the group home. At Mr. and Mrs. H.'s request, S.M. was placed at their home.

S.M. thrived in Mr. and Mrs. H.'s care. He transitioned back to a traditional school where he was receiving good grades. S.M. became close with Mr. and Mrs. H. and wanted to be adopted by them, and they wanted to adopt him. S.M. appeared to be much happier in their home than in the past and had made many friends with other children in the neighborhood. CFS recommended setting a section 366.26 hearing with a permanent plan of adoption.

In its section 366.26 hearing report, CFS recommend that the court terminate Mother's parental rights and order S.M.'s adoption by Mr. and Mrs. H. CFS reported that there were no concerns about S.M.'s development, he had successfully completed wraparound services, and he had made the honor roll at school. CFS explained that although S.M. had had behavioral issues, he had made substantial progress. He had also become attached to Mr. and Mrs. H. Mrs. H. described her relationship with S.M. as a loving mother-and-son bond. Mr. H. also reported that he had a good, positive parental relationship with S.M. Mr. and Mrs. H. were not concerned about S.M.'s past behaviors, given his significant improvement and that he appeared to be thriving in their home. Rather, Mr. and Mrs. H. were committed to raising S.M. into adulthood and asked that he be freed for adoption.

CFS reported that S.M.'s last visit with Mother was a phone call in May 2020. Although CFS had tried repeatedly to contact Mother, she did not respond or try to contact CFS. However, in April 2021, Mother called CFS asking to visit S.M., but he did not want to.

7

At a section 366.26 hearing in May 2021, the juvenile court found by clear and convincing evidence that S.M. was likely to be adopted, terminated Mother's parental rights to him, and freed him for adoption. The court noted that Mother had failed to consistently visit S.M. and thus there was no applicable exception to termination of her parental rights. Mother timely appealed.

## III.

## DISCUSSION

Mother's sole argument on appeal is that S.M. is unlikely to be adopted because of his serious behavioral issues and thus the juvenile court erroneously found that S.M. is likely to be adopted. We disagree.

At a section 366.26 hearing, the juvenile court selects and implements a permanent plan for the dependent child. (*In re K.P.* (2012) 203 Cal.App.4th 614, 620.) These include (1) adoption, necessitating termination of parental rights, (2) guardianship, or (3) long-term foster care. (§ 366.26, subds. (c)(1), (4)(A); *In re J.C.* (2014) 226 Cal.App.4th 503, 528.) If the court finds the child is adoptable, it "'shall terminate parental rights'" and select adoption as the child's permanent plan, unless it finds that one or more exceptions to the statutory adoption preference applies. (*In re K.P.*, *supra*, at p. 620; see § 366.26, subd. (c)(1)(A)-(B).) We review the record to determine if there is substantial evidence from which a reasonable trier of fact could find by clear and convincing evidence that the child was likely to be adopted within a reasonable time. (*In re J.W.* (2018) 26 Cal.App.5th 263, 267.)

8

Mother suggests that the juvenile court erred because there was no evidence that other families might adopt S.M. But that was not necessary for the court to find that S.M. was adoptable. (See *In re I.I.* (2008) 168 Cal.App.4th 857, 870 ["Here, the willingness of M.A. and J.C. to adopt supports the finding of adoptability. Since it is not even necessary that one prospective adoptive home be identified before a child may be found adoptable, a fortiori, it is not necessary that backup families be identified."].)

There is ample evidence to support the juvenile court's finding that S.M. was likely to be adopted. Mrs. H. worked with S.M. in a group home and later contacted CFS because she was interested in fostering him. By the time of the section 366.26 hearing, Mr. and Mrs. H. had cared for S.M. for about nine months. By all accounts, he was thriving. His previous behavioral issues had significantly improved, he was doing well in school, he successfully completed wraparound services, and he had become friends with children in the neighborhood. Despite his previous behavioral issues, he had not exhibited any serious behavioral problems in the nine months preceding the section 366.26 hearing, and had not had a tantrum in almost a year.

While placed in Mr. and Mrs. H., S.M. had become attached to them, and they had formed a strong parental bond with him. As of the section 366.26 hearing, S.M. wanted Mr. and Mrs. H. to adopt him, and they wanted to adopt him. They have provided for all of his needs, were committed to raising him into adulthood, and there was no indication that they were incapable of doing so.

"[T]here is no indication [S.M.'s] behavioral problems were so severe as to make the court's finding of adoptability unsupported," as Mother argues. (*In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1154.) Despite S.M.'s prior behavioral issues, which have vastly improved and which Mr. and Mrs. H. were well aware of, Mr. and Mrs. H. are still committed to adopting him, which shows that he is likely to be adopted within a reasonable time. (See *In re R.C.* (2008) 169 Cal.App.4th 486, 492 ["R.C.'s caregivers are aware of his challenges and nevertheless remain committed to adopting him. From this, a reasonable inference can be drawn that R.C.'s age, physical and emotional condition and other personal attributes are not likely to dissuade individuals from adopting him."].) Accordingly, there was substantial evidence to support the trial court's finding by clear and convincing evidence that S.M. was likely to be adopted within a reasonable time. (See *In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1650 ["[A] prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family*."]; *In re Marina S.* (2005) 132 Cal.App.4th 158, 165 ["[T]he fact that [minor's grandparents] were interested in adopting [her] by itself constitutes evidence that she was likely to be adopted."].)

IV.

DISPOSITION

The juvenile court's order terminating Mother's parental rights to S.M. and freeing him for adoption is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:


MILLER
Acting P. J.


RAPHAEL
J.